E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
CLIFFORD D. MPARE (Cal. Bar No. 337818)
Assistant United States Attorney
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4962
    Facsimile: (213) 894-0141
    E-mail:    clifford.mpare@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>JONATHAN LIPMAN,<br><br>        Defendant. | 2:23-CR-00491-FLA<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT<br><br>Hearing Date: March 8, 2024<br>Location:    Courtroom of the<br>               Hon. Fernando<br>               Aenlle-Rocha |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Clifford D. Mpare, hereby files the government's Opposition to defendant JONATHAN LIPMAN's Motion to Dismiss Indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure and the First Amendment to the United States Constitution.

    This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 23, 2024              Respectfully submitted,

                                      E. MARTIN ESTRADA
                                      United States Attorney

                                      MACK E. JENKINS
                                      Assistant United States Attorney
                                      Chief, Criminal Division

                                      _____
                                      CLIFFORD D. MPARE
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

# TABLE OF CONTENTS

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

## **Contents**

TABLE OF AUTHORITIES...............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.   INTRODUCTION..................................................1

II.  STATEMENT OF RELEVANT FACTS..................................2

III. LEGAL STANDARD...............................................7

IV.  ARGUMENT.....................................................8

     A.   Defendant's Facial Challenge Fails Under First
         Amendment Jurisprudence...................................8

     B.   The First Amendment, As Applied, Does Not Shield
         Defendant from Prosecution for the Charged Offense.......9

         1.   Defendant's Speech is Integral to Criminal
              Conduct.............................................10

         2.   Defendant's True Threats Are Not Protected by the
              First Amendment.....................................13

         3.   Defendant's Speech Does Not Relate to Matters of
              Public Concern.....................................17

     C.   The Instant Prosecution Does Not Violate the Fourth,
         Sixth, or Eighth Amendments.............................20

         1.   Defendant Does Not Provide Any Support for
              Unreasonable Search or Seizure Under the Fourth
              Amendment...........................................20

         2.   There is No Speedy Trial Act Violation.............22

         3.   Defendant's Detention Status Has Already Been
              Considered by This Court...........................22

V.   CONCLUSION..................................................23

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

**Cases**

<u>Chaplinsky v. New Hampshire</u>,
   315 U.S. 568, 571-72 (1942) ....................................... 10

<u>Dennis v. United States</u>,
   341 U.S. 494, 503 (1951) ......................................... 10

<u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>,
   472 U.S. 749, 758 (1985) ..................................... 19, 20

<u>Giboney v. Empire Storage & Ice Co.</u>,
   336 U.S., 490, 498 (1949) ........................................ 11

<u>Hustler Magazine v. Falwell</u>,
   485 U.S. 46 (1988) ............................................... 18

<u>Illinois v. Gates</u>,
   462 U.S. 213 (1983) ............................................. 21

<u>Massachusetts v. Upton</u>,
   466 U.S. 727 (1984) ............................................. 22

<u>N.Y. Times Co. v. Sullivan</u>,
   376 U.S. 254, 270 (1964) ........................................ 20

<u>Snyder v. Phelps</u>,
   131 S.Ct. 1207, 1216 (2011) ..................................... 19

<u>United States v. Bagdasarian</u>,
   652 F.3d 1113 1116 (9th Cir. 2011) .............................. 14

<u>United States v. Blue</u>,
   384 U.S. 251, 255, (1966) ........................................ 8

<u>United States v. Boren</u>,
   278 F.3d 911, 914 (9th Cir. 2002) ................................ 8

<u>United States v. Cassel</u>,
   408 F.3d 622, 627 (9th Cir. 2005) ............................... 18

<u>United States v. Covington</u>,
   395 U.S. 57, 60 (1969) ........................................... 8

<u>United States v. Gagliardi</u>,
   506 F.3d 140, 148 (2d Cir. 2007) ................................ 11

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Greany,
  929 F.2d 523 (9th Cir. 1991) ....................................... 22

United States v. Hanna,
  293 F.3d 1080, 1084 (9th Cir. 2002).............................. 14

United States v. Harris,
  705 F.3d 929, 932 (9th Cir. 2013) .................................. 9

United States v. Jensen,
  93 F.3d 667, 669 (9th Cir. 1996) ................................... 8

United States v. Johns,
  948 F.2d 599 (9th Cir. 1991) ....................................... 22

United States v. Meredith,
  685 F.3d 814, 819 (9th Cir. 2012) ................................. 11

United States v. O'Brien,
  391 U.S. 367, 376 (1968) .......................................... 19

United States v. Osinger,
  753 F.3d 939, 944 (9th Cir. 2014) ........................ 9, 10, 12

United States v. Petrovic,
  701 F.3d 849, 854-56, (8th Cir. 2012) ................... 12, 13, 19

United States v. Rogers,
  751 F.2d 1074 (9th Cir. 1985) ...................................... 8

United States v. Sayer,
  748 F.3d 425, 430, 433-34 (1st Cir. 2014) ....................... 12

United States v. Szabo,
  760 F.3d 997, 1002 (9th Cir. 2014) ............................... 14

United States v. Wright,
  215 F.3d 1020 (9th Cir. 2000) ..................................... 22

Virginia v. Black,
  538 U.S. 343, 359 (2003) .......................................... 14

Watts v. United States,
  394 U.S. 705 (1969) ............................................... 11

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                PAGE

Watts v. United States,
  394, U.S. 705, 707 (1969) ....................................... 14

**Statutes**

18 U.S.C. § 2261A(2)(A).............................................. 9

18 U.S.C. § 2251(b)(5) ............................................. 9

**Rules**

Federal Rule of Criminal Procedure 12(b)(1)......................... 8

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Over the course of eight months in 2023, defendant Jonathan Lipman ("defendant") sent hundreds of disturbing and threatening emails to a New Jersey Superior Court Judge (K.R.).  In addition to outlining fantasies of K.R.'s death in gruesome detail, defendant likened K.R. to victims of the Holocaust, sent an email containing a picture of a lever action shotgun, and "prayed" for K.R.'s death to happen "as soon as possible".  These messages were delivered between February 1, 2023 and September 22, 2023.  Defendant also researched K.R.'s address, called at least one of her neighbors in late February 2023, and left numerous voicemail messages for K.R.  Many of these messages contained imagery of death and impending harm.  Defendant's conduct did not cease until law enforcement intervened.

For this conduct, defendant is charged with one count of cyberstalking, in violation of Title 18, United States Code, Sections 2261A(2)(A), (B), 2261(b)(5).  A jury trial is set for March 26, 2024.

Defendant filed a motion to dismiss the indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure and pursuant to the First Amendment of the United States Constitution.  In his motion, defendant asserts that the First Amendment shields his conduct from prosecution.  As an initial matter, defendant raises a facial challenge to the cyberstalking statute, claiming that the statute is unconstitutionally vague and overbroad.  However, such arguments have consistently been rejected by courts that have examined the statutes, their rationale, and the conduct proscribed by their enactment.

Defendant also raises an as-applied challenge to the cyberstalking statute, proclaiming that his verbal barrage against K.R. is protected speech.  But this prosecution has nothing to do with speech by the defendant that falls under the umbrella of First Amendment protections; rather, it is about defendant's personal vendetta against the public official who presided over judicial proceedings against defendant.

Lastly, defendant's 93-page motion raises several Rule 12(b)(3)(A) arguments, including: (1) a violation of defendant's right to a speedy trial; (2) defects in the indictment; (3) a lack of specificity; and (4) failure to state an offense.  None of these arguments is availing nor satisfy the standard that must be met to dismiss the case before a trial on the merits.  Nevertheless, each is discussed below.

In sum, defendant's motion to dismiss the indictment should be denied.

## II.  STATEMENT OF RELEVANT FACTS

On October 4, 2023, defendant was charged in this district with cyberstalking, in violation of 18 U.S.C. §§ 2261A(2), (B), 2251(b)(5).  The indictment provides as follows:

1.  Beginning on an unknown date but no later than February 1, 2023, and continuing to at least on or about September 22, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant JONATHAN LIPMAN, with the intent to harass and intimidate K.R., used an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and other facilities of interstate and foreign commerce, namely, cellular telephone networks, email, interstate

wires, and the Internet, to engage in a course of conduct, described in paragraph 2 below, that placed K.R. in reasonable fear of death and serious bodily injury to K.R., and that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to K.R.

2.   Defendant LIPMAN's course of conduct included, among other things, the following:

a.   On or about February 1, 2023, defendant LIPMAN sent an email to K.R. which contained a photograph of what appeared to be a lever action shotgun and the following text: ";)".

b.   On or about February 1, 2023, defendant LIPMAN called E.C.[1] and told her he had a message for her and K.R., namely that "it's a shame there are kids that get shot up in schools instead of you people."

c.   On or about February 4, 2023, defendant LIPMAN sent at least six emails to K.R., including the following:

i.   an email stating, among other things, "you make the world a worse place.  People will know your name."

ii.   an email stating, among other things, "Just because I say [K.R.] would make a better corpse than a person doesn't mean I'm going to make her a corpse."

iii.   an email titled "I'll make sure you get a copy of a script you are in," in which defendant LIPMAN wrote, "it's got a photo of your head on a mantle."

---

[1] A probation officer in the Ocean County Superior Court.  E.C. was responsible for coordinating the court calendar for K.R. and received several messages and voicemails from defendant.

3

d.   On or about February 23, 2023, defendant LIPMAN called and left a voicemail for E.O., who is K.R.'s neighbor, and to whom defendant LIPMAN had no prior known connection.

e.   On or about March 14, 2023, defendant LIPMAN sent at least two emails to K.R., including the following:

i.    an email stating, among other things, that "Cancer and coronavirus and emphysema exist to balance out bigots like you abusing your privilege."

ii.    an email stating, among other things, "Who the world will be much better off as a corpse than a person."

f.   On or about March 28, 2023, defendant LIPMAN sent at least three emails to K.R., including the following:

i.    an email titled "Your death," in which defendant LIPMAN wrote, "I pray every single day that you suffer a slow and painful death" and "I pray you have some issue with your lungs and your family watches you die slowly struggling to breath like many Jews in the holocaust."

ii.    an email titled "Seriously after the life [K.R.] has lead," in which defendant LIPMAN wrote, "She's deserves to spend a decade in geriatric struggle and misery as her family helplessly watches."

iii.    an email stating, among other things, "as you struggle to breath or what ever consequence of your selfish little life befalls your body and betrays your existence, you will remember me" and "Your concerns about where you are headed are warranted. Some call it hell."

g.   On or about July 23, 2023, defendant LIPMAN sent at least 11 emails to K.R., including the following:

4

i.      an email titled "Let us pray that [K.R.] dies as soon as possible," in which defendant LIPMAN wrote, "Let us pray that [K.R.] dies suffocating in her own body" and "Please god kill her violently.  but with cancer or a lower gi bleed.  something long and dragged out that robs her of her ability to speak for years."

ii.      an email titled "let us pray that [K.R.'s] family watches her die slowly in hospice," in which defendant LIPMAN wrote, "let her last moments wander to wondering if her family even wants to be there as she suffocates to death for her lifetime of sins."

iii.      an email titled "the world would be better off if [K.R.] died tomorrow," in which defendant LIPMAN wrote, "massive car accident.  gunshot wound.  beheading.  stroke" and "'justice' is her suffering in a body she can't escape.  emphysema sounds like justice."

iv.      an email titled "plenty of people realize as humans they make the world a worse place," in which defendant LIPMAN wrote, "once again let us pray that [K.R.] dies the most painful natural death possible.  or decapitation."

v.      an email titled "Let us fantasize about a terrible human being masquerading as a judge dying," in which defendant LIPMAN wrote, an elaborate fantasy about K.R. being tortured and killed by the founding fathers.  The email further states, "Let us imagine" several American historical figures "breaking into [K.R.'s] house in the middle of the night and removing her at gun point."  Defendant LIPMAN also wrote, "Lets imagine [K.R.] being dragged to the gallows.  [K.R.] is begging and pleading like a nazi, saying she was just following orders.  people throw feces on her.  they throw urine on her.  [K.R.] is stipped naked and forced to

5

1    walk . . . By the time [K.R.] gets to the gallows she is silent.

2    They hang her" and "[K.R.] doesnt die right away.  She

3    suffocates.  It takes minutes.  [K.R.'s] face turns purple.  Her eyes

4    get red.  Her blood vessels pop.  All the fluid in her face comes out

5    of her eyes and mouth.  she can no longer even be the only person who

6    would cry about her death . . . Then [K.R.] is beheaded.  Her head is

7    placed on a stick.  Her limbs and body parts sold as souvenirs.  200

8    years later her ribcage still hangs in a tavern."

9           vi.    an email titled "knives over guns," in which

10   defendant LIPMAN wrote, "guns are too quick," and "now I could be

11   talking about in a movie tv show.  I could be talking about in a

12   book.  I could be talking about a radio play."

13          vii.   an email in which defendant LIPMAN wrote, "the

14   ted bundy's.  The people who target an individual.  They get the

15   attention. . .  They generally dont use don't use guns either.  it's

16   the gun that usually gets them caught.  They just like strangle

17   people or use knives.  and then one day they screw up their routine

18   and use the gun they had just in case and their story ends.  But its

19   the people who use their hands that make the most noise long term."

20          viii.  an email in which defendant LIPMAN wrote, "no one

21   said [K.R.] will have a knife held to her throat," and "she deserves

22   to imagine a knife being held to her through though."

23          ix.    an email titled "Its lung cancer though right!?"

24   in which defendant LIPMAN wrote, "the real fantasy is [K.R.'s] body

25   betraying her and her being forced to sit in a room, struggling to

26   survive herself.  Struggling to get her lungs or heart to

27   work.  dealing with one of the great human ironies of all.  Not

28

6

1  wanting to die, but wanting to die.  Fighting death for way so long

2  that eventually you realize its the best thing that could happen."

3      x.    an email titled "A violent terroristic threat,"

4  in which defendant LIPMAN wrote, "make sure to remove [defendant

5  LIPMAN's] right to own weapons.  Don't just limit it to guns."

6      h.    On September 22, 2023, defendant LIPMAN sent an email

7  to [K.R.] and others in which he wrote, "The world would be better

8  off if you all died" and "I want you to spend years contemplating

9  suicide over your failing health.  Having to choose between another

10  year of labored breathing or potentially going to hell for suicide."

11  **III. LEGAL STANDARD**

12      "Because it is a drastic step, dismissing an indictment is a

13  disfavored remedy."  United States v. Rogers, 751 F.2d 1074 (9th Cir.

14  1985) (citing United States v. Blue, 384 U.S. 251, 255, (1966).  "In

15  ruling on a pre-trial motion to dismiss an indictment for failure to

16  state an offense, the district court is bound by the four corners of

17  the indictment."  United States v. Boren, 278 F.3d 911, 914 (9th Cir.

18  2002) (citing United States v. Jensen, 93 F.3d 667, 669 (9th Cir.

19  1996).  "A motion to dismiss the indictment cannot be used as a

20  device for a summary trial of the evidence . . . The Court should not

21  consider evidence not appearing on the face of the indictment."

22  Jensen, 93 F.3d at 669.

23      Federal Rule of Criminal Procedure 12(b)(1) provides that a

24  party may raise by pretrial motion any defense "that the court can

25  determine without a trial on the merits."  See United States v.

26  Covington, 395 U.S. 57, 60 (1969) (Rule 12 permits defendant to raise

27  in pretrial motion only defenses capable of determination without

28  trial of the general issue).

Here, as the defendant acknowledges throughout his motion, the operative facts underlying this case are essentially undisputed. See, e.g., Def. Mot. at 14, 21 (admitting defendant sent February 1, 2023 email to K.R. depicting what appears to be an image of a lever action shotgun); Def. Mot. at 22 (admitting defendant called E.C. on February 1, 2023, stating "it's a shame there are kids that get shot up in schools instead of you people); Def. Mot. at 29 (admitting defendant contacted K.R. through her "state owned email address"); Def. Mot. at 14 (admitting defendant continued to send emails after being admonished by law enforcement regarding his conduct).  What remains in dispute is whether: (1) defendant's conduct falls under First Amendment protections; and (2) the indictment adequately alleges that defendant acted with the requisite mens rea.

IV.  **ARGUMENT**

   **A.   Defendant's Facial Challenge Fails Under First Amendment Jurisprudence**

First, defendant argues that 18 U.S.C. § 2261A is facially unconstitutional because it prohibits speech protected by the First Amendment.  Defendant also contends that 18 U.S.C. § 2261A(2)(A) is vague and overly broad because the statute proscribes a "standardless" course of conduct.  See Def. Mot. at 32.

"In a facial challenge, a statute is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. . . ." United States v. Osinger, 753 F.3d 939, 944 (9th Cir. 2014) (quoting United States v. Harris, 705 F.3d 929, 932 (9th Cir. 2013).  "[B]ecause 18 U.S.C. § 2261 proscribes harassing and intimidating conduct, the

8

statute is not facially invalid under the First Amendment.  In particular, 18 U.S.C. § 2261A specifically criminalizes 'a course of conduct that . . . causes . . . substantial emotional distress to [the harassee]." Osinger, 753 F.3d at 944 (emphasis in original). "Additionally, 18 U.S.C. § 2266(2) provides that '[t]he term "course of conduct" means a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose.'" Thus, the proscribed acts are tethered to the underlying criminal conduct and not to speech." Id. "[B]ecause the statute requires both malicious intent on the part of the defendant and substantial harm to the victim, it is difficult to imagine what constitutionally-protected speech would fall under these statutory prohibitions." Id.

As Osinger makes clear, prosecution under 18 U.S.C. 2261A(2) is lawful because it punishes a course of conduct in which it is difficult to conceive of a legitimate purpose behind the speech in question.  Defendant's facial challenge thus fails.  Additionally, as discussed below, defendant's conduct, as alleged, also falls within the ambit of Section 2261A(2).

### B.  The First Amendment, As Applied, Does Not Shield Defendant from Prosecution for the Charged Offense

Next, defendant claims the indictment should be dismissed because the cyberstalking statute, as applied to his conduct, violates his free speech rights.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  This freedom of speech, however, "is not an unlimited, unqualified right." Dennis v. United States, 341 U.S. 494, 503 (1951).  The Supreme Court has long recognized that some limited categories of speech have so little

1    social value that they are excluded from the protections of the First

2    Amendment.  <u>See</u> <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 571-72

3    (1942).  These categories of speech include obscenity, defamation,

4    fraud, incitement, true threats, and speech integral to criminal

5    conduct.  <u>See</u> <u>Watts v. United States</u>, 394 U.S. 705 (1969); <u>United</u>

6    <u>States v. Meredith</u>, 685 F.3d 814, 819 (9th Cir. 2012).

7         Though his argument is not entirely clear, defendant appears to

8    claim that his speech should be afforded First Amendment protections

9    because it was used to "[air] grievances and [complaints] against

10   society that has allowed judges and the government to not only

11   subvert the 'word' the truth, god, but become god," Def. Mot. at 4,

12   and "protest the removal of constitutional rights," Def. Mot. at 14.

13   Defendant also contends that his messages were cabined by statements

14   about his nonviolent nature and other qualifications made in some of

15   his messages.

16        Defendant's assertions are unavailing.  As explained below,

17   defendant's motion fails as a matter of law.  Defendant's speech is

18   excluded from First Amendment protection because it constitutes

19   speech integral to criminal conduct, and/or true threats.  Further,

20   even if the Court concludes that some of the speech falls outside

21   these specific categories, defendant's speech fails to address any

22   matters of public concern and has little (if any) constitutional

23   value, such that its limitation during this prosecution does not

24   raise First Amendment concerns.

25        1.   <u>Defendant's Speech is Integral to Criminal Conduct</u>

26        The First Amendment does not protect "speech or writing used as

27   an integral part of conduct in violation of a valid criminal

28   statute."  <u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 498

1  (1949).  "[W]here speech becomes an integral part of the crime, a

2  First Amendment defense is foreclosed even if the prosecution rests

3  on words alone."  Osinger, 753 F.3d at 946 (internal quotation marks

4  omitted); see also United States v. Gagliardi, 506 F.3d 140, 148 (2d

5  Cir. 2007) ("speech is not protected by the First Amendment when it

6  is the very vehicle of the crime itself.").

7       Defendant's arguments directly contradict a chain of Circuit

8  court decisions rejecting similar as-applied challenges to the

9  cyberstalking statute and finding the speech at issue integral to the

10 charged criminal conduct.  See Osinger, 753 F.3d at 946-48 (rejecting

11 as-applied challenge to § 2261A(2) on the ground that defendant's

12 speech was integral to a charged pattern of harassment); United

13 States v. Sayer, 748 F.3d 425, 430, 433-34 (1st Cir. 2014) (affirming

14 denial of motion to dismiss asserting as-applied challenge to

15 cyberstalking statute because "everything that [defendant] allegedly

16 said was integral to criminal conduct, his criminal conduct seeking

17 to injure, harass, or cause substantial emotional distress to the

18 victim, and so not protected by the First Amendment under Giboney")

19 (internal quotation marks omitted); United States v. Petrovic, 701

20 F.3d 849, 854-56, (8th Cir. 2012) (concluding defendant's speech was

21 integral to the extortionate threats he made in violation of 18

22 U.S.C. § 875(d)).

23      In Osinger, the defendant allegedly posted demeaning statements

24 and photographs regarding his ex-girlfriend ("V.B.") on Facebook and

25 sent threatening and sexually explicit text messages and emails to

26 V.B., her co-workers, and friends.  Osinger, 753 F.3d at 941-42, 945

27 (describing defendant's "unrelenting harassment and intimidation of

28 V.B.").  The Ninth Circuit concluded that "[a]ny expressive aspects

of Osinger's speech were not protected under the First Amendment because they were 'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress to V.B." Osinger, 753 F.3d at 947.

Similarly, in Petrovic, the defendant allegedly engaged in a campaign of vengeful harassment against his girlfriend ("M.B.") after their separation. See Petrovic, 701 F.3d at 852-53. The defendant created websites containing sexually explicit materials of M.B., mailed homemade postcards to members of M.B.'s community which included revealing photographs of M.B. and derogatory statements about M.B. (for example, describing M.B. as "just a whore 4sale"). The defendant also mailed packages containing enlarged photographs of M.B. engaged in various sex acts with Petrovic to M.B. at her work, to M.B.'s boss, M.B.'s family members, and the home of M.B's ex-husband, where M.B.'s seven-year old child viewed the pornographic materials. Id. In addition, the defendant made repeated harassing phone calls to M.B.'s workplace. Id.

Nothing related to defendant's charged conduct necessitates a different result from these decisions. All of the expression at issue – defendant's harassing emails and voicemails — was integral to the criminal conduct charged in the indictment under Sections 2261A(2), (B), and 2261(B)(5). The expression was the means by which defendant carried out a pattern of retaliatory harassment and intimidation against K.R. Over the course of eight months, defendant sent threatening and harassing emails, voicemails, and text messages to K.R. and members of her community. Defendant made repeated harassing phone calls to K.R.'s workplace, her colleagues, and support staff. And defendant's conduct persisted – even after

12

1    admonishment by law enforcement.  Much like Osinger and Petrovic,

2    defendant's speech was integral to his criminal conduct of harassing,

3    intimidating, and causing emotional distress to K.R.

4              2.   Defendant's True Threats Are Not Protected by the
                    First Amendment
5

6         Defendant's motion to dismiss also fails because some of the

7    speech at issue must be considered "true threats," and, thus,

8    excluded from First Amendment protection.

9         Speech that "threatens a person with violence is not protected

10   by the First Amendment."  United States v. Szabo, 760 F.3d 997, 1002

11   (9th Cir. 2014) (internal citation omitted).  "Threats, in whatever

12   forum, may be . . . proscribed without implicating the First

13   Amendment."  Id. at 1002 (emphasis in original).  The Supreme Court

14   has "left no doubt that true threats [can] be criminalized because

15   they are not protected speech."  United States v. Hanna, 293 F.3d

16   1080, 1084 (9th Cir. 2002) (citing Watts v. United States, 394 U.S.

17   705, 707 (1969)); United States v. Bagdasarian, 652 F.3d 1113, 1116

18   (9th Cir. 2011) (the First Amendment does not immunize "true

19   threats") (citing Virginia v. Black, 538 U.S. 343, 359 (2003)).

20        Here, defendant's speech was not only integral to criminal

21   conduct, but in many instances, truly threatening.

22        In a March 28, 2023 email titled, "The god I don't believe in

23   will answer my prayers," defendant wrote to K.R., "Your so arrogant

24   you will try to pretend it's a coincidence.  But as you struggle to

25   breath or what ever consequence of your selfish little life befalls

26   your body and betrays your existence, you will remember me.  Your

27   concerns about where you are headed are warranted.  Some call it

28   hell[.]  Only you can make it eternal[.]"

In a July 23, 2023 email titled, "Let us fantasize about a terrible human being masquerading as a judge dying," defendant wrote to K.R., "Let us imagine Alexander [sic] Burr, Alexander Hamilton, Patrick Henry, James Madison, thomas paine [sic], and John Jay, all gun owners who called for the execution of tyrants like [K.R.], breaking into [K.R.'s] house in the middle of the night and removing her at gun point . . . . Let us imagine [K.R. is begging and pleading like a nazi, saying she was just following orders. people throw feces on her. they throw urine on her. They hang her . . . . this is a lynching. Like shes a black person a bigot like her would have overlooked. Its slow . . . . It takes minutes. [K.R.'s] face turns purple. Her eyes get red. Her blood vessels pop. All the fluid in her face comes out of her eyes and mouth. she can no longer even be the only person who would cry about her death. <u>She kicks and flails until the end fighting what the world wants, what the world needs</u>. One less bigot imposing their superiority on the other animals human and non human. Then [K.R.] is beheaded. <u>Her head is placed on a stick</u>. Her limbs and body parts sold as souvenirs. 200 years later her ribcage still hangs in a tavern . . . . <u>[K.R.] will pay for her crimes against humanity</u> exactly how it was stated before she violated the constitution."

In a July 23, 2023 email titled, "knives over guns," defendant wrote to K.R., "<u>guns are too quick</u>" and "now I could be talking about in a movie or tv show[.] I could be talking about in a book[.] I could be talking about a radio play[.]"

Less than twenty minutes later, in an email titled, "you know what you notice when you watch 'Law' shows," defendant wrote to K.R., "[t]hose true crime shows[.] The people who go on a rampage and kill

like 48 people. [l]ike that vegas guy.  the people who use a gun and take out a classroom.  They don't get fame.  They don't get covered as a story long term; only short tem [sic].  then They get buried. They get forgotten.  Their motives don't matter.  The event is too quick.  The event is too random.  Too possible to affect any person for humans to pay it any true attention.  But the ted bundy's.  the people who target an individual.  they get attention.  they get people focused on them. They generally dont use guns either.  it's the gun that usually gets them caught.  They just like strangle people or use knives.  and then one day they screw up their routine and use the gun they had just in case and their story ends.  But its the people who use their hands that make the most noise long term."

In another July 23, 2023 email titled, "just for the record," defendant wrote to K.R., "no one said [K.R.] will have a knife held to her throat.  she deserves to imagine a knife being held to her throat though . . . . [s]he deserves to think about it every moment for the rest of her life."

/// 

/// 

15

1     In a February 1, 2023 email, defendant sent an email titled, "is

2  a photo illegal?", which includes only a winking face emoji and an

3  embedded photograph of what appears to be a lever action shotgun.

4

5

6

7



8

9

10

11

12

13

14

15

16

17

18

19

20

21     Defendant attempts to characterize these statements not as

22  threats, but as "fantasy," an exercise in First Amendment rights, and

23  expression.  In addition, defendant alludes to the satirical nature

24  of these messages, and points to qualifications in some of his

25  messages.

26     These arguments are belied by defendant's threatening messages

27  themselves.  Defendant's messages, his overt suggestions of harm to

28  K.R., references to serial killers and mass shooters, descriptions of

                                    16

capital punishment for K.R., and a photograph of a firearm could each be construed as true threats to K.R.'s physical safety and suggesting defendant's desire to harm K.R.

Threats to kill or harm are "of such low value and inflict such serious harm that they are outside the protection of the First Amendment." United States v. Cassel, 408 F.3d 622, 627 (9th Cir. 2005). As such, this speech by defendant does not warrant First Amendment protections. In addition, it is undisputed that satire about public figures may fall under the First Amendment's protections. See, e.g., Hustler Magazine v. Falwell, 485 U.S. 46 (1988) (discussing the First Amendment value of "the political cartoon or caricature," such as a "cartoon portraying George Washington as an ass"). However, there is nothing satirical, humorous, or whimsical about defendant's messages to K.R. Defendant describes K.R. dying in horrifying fashion, portrays her "head on a mantle," and suggests that she will die gasping for breath, like victims of the Holocaust. Unquestionably, the threatening nature of these messages is not exempt from prosecution under any reading of the First Amendment.

### 3. Defendant's Speech Does Not Relate to Matters of Public Concern

Should the Court conclude that some of the speech at issue does not fall under the categories discussed above, prosecution of defendant's conduct is still legitimate because the speech is virtually devoid of any constitutional value.

"When 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government interest in regulating the nonspeech can justify incidental limitations on First

Amendment freedoms." United States v. O'Brien, 391 U.S. 367, 376 (1968); see also Petrovich, 701 F.3d at 854 (identifying O'Brien intermediate scrutiny as potentially applicable to a challenge to § 2261A(2), but finding it unnecessary to apply it because defendant's messages were unprotected speech integral to criminal conduct).

Defendant attempts to frame his speech as related to a public figure on a topic of public importance.  The Supreme Court has held that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985) (internal quotation marks omitted).  However, "not all speech is of equal First Amendment importance," and "speech on matters of purely private concern is of less First Amendment concern." Id.

Whether speech addresses a matter of public concern must be determined by its "content, form, and context." Id.  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Snyder v. Phelps, 131 S.Ct. 1207, 1216 (2011).

The speech at issue in this prosecution is far removed from any such political or social value and rests well outside the bounds of the First Amendment.  It includes, among many other things, the following:

- an email from defendant noting that "it's a shame there are kids that get shot up in schools instead of you people."

18

- an email from defendant stating, among other things, "you make the world a worse place.  People will know your name."
- an email from defendant stating, among other things, "[j]ust because I say [K.R.] would make a better corpse than a person doesn't mean I'm going to make her a corpse."
- an email from defendant titled, "I'll make sure you get a copy of a script you are in," in which defendant wrote, "it's got a photo of your head on a mantle."
- an email from defendant stating, among other things, "I pray every single day that you suffer a slow and painful death" and "I pray you have some issue with your lungs and your family watches you die slowly struggling to breath like many Jews in the holocaust."
- an email from defendant stating, "[l]et us pray that [K.R.] dies suffocating in her own body" and "Please god kill her violently.  But with cancer or a lower gi bleed.  Something long and dragged out that robs her of her ability to speak for years."

There is no credible argument that such speech addresses matters of public concern and thus "requires special protection to ensure that 'debate on public issues [will] be uninhibited, robust, and wide-open.'"  Dun & Bradstreet, 472 U.S. at 762 (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).  This prosecution concerns defendant's personal attacks on K.R., his frustration with the circumstances defendant finds himself in, and efforts to harm K.R. with words of threat and intimidation.  There is nothing inherent in defendant's speech that merits First Amendment protection as relating to any political, social, or community-based concern.

Nor does the speech address a legitimate news interest.  All of defendant's speech falls outside of this framework and lacks any constitutionally protected matter.

**C.   The Instant Prosecution Does Not Violate the Fourth, Sixth, or Eighth Amendments**

Defendant alleges a number of other defects to this prosecution, including violations of the Fourth, Sixth, and Eighth Amendments to the Constitution.  Each will be discussed briefly in turn.

      1.   <u>Defendant Does Not Provide Any Support for Unreasonable Search or Seizure Under the Fourth Amendment</u>

Defendant appears to claim violations of the Fourth Amendment in the instant motion, including that the search warrant and gathering of evidence in this case violated defendant's Fourth Amendment rights.  Def. Mot. at 2.  Defendant does not provide any support for these claims.

Initially, the government notes that even if defendant's Fourth Amendment claims had merit, suppression would be the appropriate remedy, not dismissal.  In any event, defendant's arguments are wholly without merit.  On September 7, 2023, agents obtained a warrant to search defendant's residence in Los Angeles.  The warrant was executed on September 15, 2023.  Upon arrival, officers spoke with defendant, informed him of the nature of their investigation into defendant's conduct, and seized several digital devices and written documents, as permitted by the September 7, 2023 warrant.  As explained below, Special Agent Tomes's affidavit clearly provided a substantial basis for the issuing judge to find probable cause.

The Supreme Court has repeatedly reminded reviewing courts not to subject search warrant affidavits to <u>de novo</u> review.  <u>Illinois v.</u>

20

Gates, 462 U.S. 213, 236 (1983) (upholding validity of a search warrant for the home and car of two defendants based upon a partially corroborated anonymous tip and holding that "[o]nly the probability, and not a prima facie showing of criminal activity is the standard of probably cause); see also Massachusetts v. Upton, 466 U.S. 727, 733 (1984) ("A grudging or negative attitude by reviewing courts toward warrants is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case."). Instead, a court's decision to issue a search warrant must be upheld if the court had a "substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Greany, 929 F.2d 523, 524 (9th Cir. 1991); United States v. Wright, 215 F.3d 1020, 1025 (9th Cir. 2000) ("We review to determine whether the magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause."). Even in "doubtful" cases, the reviewing court should defer to the warrant's validity. United States v. Johns, 948 F.2d 599, 602 (9th Cir. 1991).

Here, the search warrant for defendant's apartment was supported by ample probable cause. Special Agent Tomes's affidavit set forth facts that, under the totality of circumstances, clearly demonstrated a "fair probability" that evidence of defendant's conduct would be found in his residence. This included details about the Special Agent's investigation, correspondence with law enforcement, and descriptions of defendant's course of conduct through electronic means (as described throughout this opposition). See In the Matter

1   of the Search of a Residence Located [in] . . . Los Angeles, CA

2   90025, 2:23-mj-04563-DUTY, Dkt. No. 1-1.

3        This Court must give substantial deference to the magistrate

4   judge's determination that there was probable cause to search the

5   apartment for evidence of defendant's conduct.  In this circumstance,

6   there was ample support of a finding of probable cause and the

7   search/seizure of items identified in defendant's apartment.

8   Defendant's Fourth Amendment challenge cannot prevail.

9            2.   There is No Speedy Trial Act Violation

10       In passing, defendant's motion also claims violations of the

11  Speedy Trial Act.  But defendant provides almost no factual or legal

12  support for this claim.

13       On October 4, 2023, defendant was indicted.  Trial was initially

14  scheduled for November 28, 2023.  On November 20, 2023, this Court

15  issued a Speedy Trial Act order continuing the trial date to March

16  26, 2024, and based its order on former defense counsel's trial

17  schedule, need to prepare for trial and confer with defendant, need

18  to review the discovery and evidence in this case, and need to

19  prepare any potential pretrial motions.  (Dkt. No. 29).  Trial is

20  currently set for March 26, 2024 and additional continuances are not

21  expected.  Defendant has not presented any support for the purported

22  violations of the Speedy Trial Act, nor has he alleged his claims

23  with any specificity.  As such, the Court should reject his Speedy

24  Trial claims

25            3.   Defendant's Detention Status Has Already Been
                   Considered by This Court
26

27       Defendant raises arguments related to his custodial status.  In

28  November 2023, the parties briefed defendant's detention status.  On

22

November 17, 2023, before this Court, such arguments were discussed, and the Court ultimately denied defendant's motion for reconsideration.  (Dkt. No. 28).  Nothing has changed since the November 2023 order.  Defendant provides no availing arguments in support of another review of his detention status, nor does his current detention status warrant the extreme remedy of dismissing the indictment.  This request should also be denied.

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to dismiss the indictment.