TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

---

Jonathan Lipman
American Citizen
Federal Detainee 79509-510
  Metropolitan Detention Center Los Angeles
  P.O. Box 531500
  Los Angeles CA, 90053
  Telephone: N/A - Cant even get the Federal Government Detention Center to give me legal phone calls
  Email: N/A - Cant even get the Federal Government Detention Center to consistently deliver my legal mail

Defendant
Jonathan Lipman

FILED
CLERK, U.S. DISTRICT COURT
JUN - 5 2025
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

United States District Court
For the Central District of California

| | |
|---|---|
| United States of America | No: 2:23-cr-00491-FLA |
| v. | Brief regarding prosecutorial misconduct, misdiagnosis of autism, and Ineffective assistance of counsel |
| Jonathan Lipman | |
| | June 2nd, 2025 |
| | Trial Date: May 13, 2025 |

Defendant Jonathan Lipman, through the postal service of a federal government detention center, hereby files this brief regarding the Federal Governments prosecutorial misconduct, the misdiagnosis of autism, and ineffective assistance of counsel. Defendant motions for his conviction to be o_____ __d, hi_ ____ts to be reinstated, and a new trial be scheduled as soon as possible.

Dated: June 2nd, 2025

                                                               Jonathan L. _Lipman 6/2/25_
                                                               Defendant

TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

---

Defendant motions for a mistrial, moves for his conviction to be overturned, moves for his pro-se 6th amendment right to be reinstated, and moves for a new trial to be rescheduled as soon as possible.

Defendant alleges in the supplemental brief to this motion: prosecutorial misconduct, ineffective assistance of counsel, and that the diagnosis of autism that effected nearly every decision of defense and infected the trial was a misdiagnosis. This brief alleges defendants attorneys violated defendants due process right to testify and hid from the court that evaluator BJ Freeman was potentially suffering from a mental defect that affected the reliability of her diagnosis of autism.   "While an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to be the result of reasonable professional judgement', Strickland, 466 U.S. at 690, the court considers counsels conduct as a whole to determine whether it was constitutionally adequate. (Browning v Baker, 875 F.3d 444, 471 (9th Cir. 2017) (emphasis in original)(internal quotation edited); see also Woods v Sinclair, 764 F.3d 1009, 1139 (9th cir. 2014) (considering cumulative impact of [petitioners] counsel's deficiencies); Davis v Woodford, 384 F.3d 628, 654 (9th cir. 2004)" (Burney v Broomfield Case No. 2:10-cv-00546-FLA; 2022).

"The court must also consider any prosecutorial misconduct cumulatively. See Hein v Sullivan, 601 F.3d 897, 915 (9th cir. 2010)("[W]e first analyze the prosecutorial misconduct challenges to assess whether they so infected the trial with unfairness as to make the resulting conviction a denial of due process. If the prosecutions comments alone do not meet this standard, we analyze them together with the non-disclosure for materiality; cf. Wearny v Cain, 577 U.S. 385, 392, 136 S.ct. 1002, 194 L. Ed. 2d 78 (2016)(per curian)" (Burney v Broomfield; 2022). "Beyond the cumulative effect of any ineffective assistance of counsel and prosecutorial misconduct, 'prejudice may result from the cumulative impact of muliple defiencies' Harris [by and through Ramseyer v. Wood] 64 F.3d at 1438-39" (Burney v Broomfield; 2022).

The District court, this trial court, is free to consider this motion for mistrial a 2241 before sentence or a limited 2255. This trial court is free to put aside the other arguments regarding first amendment free speech rights or 6th amendment speedy trial rights that will accompany any appeals or future writs of habeas corpus and render the decisions required to schedule a new trial. "28 USCS 2241 does not deny Federal courts the power to fashion appropriate relief other than immediate release. Peyton v Rowe 391 U.S. 54, 88 S.Ct 1549, 20 L. Ed. 2d 426 (1968)." (Burney v Broomfield Case No. 2:10-cv-00546-FLA)

TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

---

2:23-cr00491-FLA
Legal Brief: Prosecutorial Misconduct, Misdiagnosis of Autism, and ineffective assistance
I.) Prosecutorial Misconduct

In the trial of U.S. vs Jonathan Lipman 2:23-cr-00491-FLA, the U.S. Attorneys Office made a deliberate effort to withhold from the jury the truth: that defendant sent communications of similar content and in similar amount to over a dozen Judicial officers holding positions such as judge, prosecutor, clerk, and counsel for the government. The attorneys office misconducted a trial, which is intended not to find a defendant guilty but to be a vehicle for a jury representing society to search for and find the truth; a vehicle to use the truth to decide if a particular law should be used by the government to control unwanted conduct in society.

Despite this intended purpose of truth, the government chose not to present the jury evidence the petitioner was communicating the same language to multiple representatives of government. The government withheld hundreds of pieces of evidence that the petitioner was not communicating to a single individual but to a branch of government. The attorneys office misconducted petitioners trial because pretending that the petitioner targeted a specific individual rather than "the judiciary" was necessary to fulfill the statutory terms of the cyberstalking statute. The government made no attempt to hide this manipulation. They closed their presentation and argument in trial by lying to the jury and stating that "the defendant was not targeting the whole judiciary but fixated on a single judge, Kimarie Rahill".

The government was well aware of their problem of finding a statute that could applicably criminalize petitioners conduct of repeatedly communicating similar language to a dozen judicial officers. That is why the government repeatedly changed its allegation of which law or which part of a law made petitioners conduct illegal and enabled them to control petitioners conduct. From July to September of 2023 petitioner was investigated by the FBI for threats by interstate communication [18 USC 875(c)], cyberstalking [18 USC 2261A(2)(A)], and unlawful person with a firearm [18 USC 922(g)]. On September 26, 2023 after a 3 month investigation petitioner was arrested for making threats [18 USC 875(c)] "for sending hundreds of harassing and threatening emails to New Jersey public officials including Lacey Municipal Judge Mabie, Oceanport Municipal Judge Patti, Lacey Township official Bruce Pad[u]la, Ocean [County] Superior Court Judge Rahill, and several others. In many of these emails, Lipman wrote in explicit detail how Lipman hoped the aforementioned Public Officials would die painful, gruesome, and violent deaths. (Warrant for arrest, 2:23-cr-00491-FLA, document 1). Though the government could have also arrested petitioner for cyberstalking, the attorneys office chose not to because the government realized a person couldnt statutorily cyberstalk an entire group of people.

After some of the alleged victims of "threats" told the FBI in interviews that they did not take the repeated communications seriously, the government investigated further and determined the content of petitioners communications did not reach the threshhold of speech constitutionally excepted by the first amendments "true threats" exception. The government couldnt admit that it arrested and detained petitioner prematurely, so it started pretending that its theory of criminality was that the petitioner targeted or fixated on a single individual. On October 4th petitioner was indicted for one count of cyberstalking [18 USC 2261A (2)(A);(B)] for the intent to harass and intimidate and for causing fear of bodily harm or death and substantial emotional distress. On October 11th, 2023 "the united states moved for a dismissal of the complaint" (Document 15 2:23-cr-00491-FLA) that petitioner violated 18 USC 875(c) [threats].

On March 22, 2024 in repsonse to petitioners arguments in his motion to dismiss that the governments indictment was flawed and the government couldnt charge a defendant for (A);(B) because the statute clearly stated "A; or B" (Documents 59 and 75 2:23-cr-00491-FLA). "the government...elect[ed] to proceed solely on the theory that [petitioner] violated 18 USC 2261A(2) (B)" (Gov.'s brief...stalking offense Document 88 page 3 line 9-10). Though the government originally arrested petitioner for threats and had 3 weeks earlier in their opposition to dismissal alleged that "the speech at issue must be considered 'true threats', and thus, excluded from first amendment protection" (Gov.'s opposition to...motion to dismiss Document 66 pg 13 line 7 -8), the government ceased claiming that petitioner "engaged in a course of conduct that placed K.R. in a reasonable fear of death and serious bodily injury" (indictment Document 12 pg 1 line 26-27).

The government, despite being unsure of the effect of petitioners conduct or how to apply the law, continuously changed its theory of petitioners conduct multiple times. The government was willing to change its allegation and theories of criminality because it was more interested in finding petitioner guilty than following statutory law or rules of criminal procedure. If congress wrote no statute criminalizing repeated communications to a dozen judicial officers, the attorneys office would simply change how an already written law was applied without congressional approval by pretending petitioners conduct focused on one person.

18 USC 2261A(2) states "whoever with the intent to kill, injure, harass, or intimidate or surveil with the intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication system or system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that - (A) places that person in a reasonable fear of the death of or serious bodily injury to a person, pet, service animal...or (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person...shall be punished as provided in section 2261(b) [18 USC 2261A(2)].["]

Multiple courts of appeal have noted that the cyberstalking statute criminalizes conduct that targets a specific, private individual. "'It is an element of the crime that [the defendant] intended to harm a particular victim". (3rd cir. U.S. v Matusiewicz, Gonzalez; 2018). "The statutes terms unambiguously contemplate that the unit of prosecution is the targeted individual requiring that the defendant act with intent toward a particular person" (U.S. v Shrader; 4th cir.; 2011). "Osingers applied

TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

---

challenge is similarly unavailing given his intent to harass and intimidate a private individual" (U.S. v Osinger; 9th cir; 2013).

The U.S. governments attorney's office for the Central District of California was well aware that conduct in which a person was communicating with multiple government officials would imperil a prosecution of cyberstalking. This is why the government chose not to indict petitioner for multiple counts of cyberstalking "New Jersey Public officials including Lacey Municipal Judge Mabie, Oceanport Municipal Judge Patti, Lacey Township Official Bruce Pad[u]la, Ocean [County] Superior Court Judge Rahill, and several others" (Warrant For Arrest 2:23-cr-00491-FLA Document 1) when their attempt to arrest defendant for multiple counts of threats [875(c)] failed. The government would likely have to try defendant for all the counts in the same trial since it was part of the same conduct. Such an indictment and trial would give a jury a true picture of petitioners conduct and endanger a jury finding defendant guilty for "stalking", a simple premise that people understand requires an obsession with one individual and not the judiciary of coastal New Jersey. It might also help defendant win an appeal because this contact would be part of the court record and he wouldnt have to beg a court to review the whole record of communications.

The government had plenty of "testimony and digital evidence regarding...defendants contact with several public officials and court personnel" (Gov.'s motion...contact with other public officials 2:23-cr-00491-FLA Doc. 57 pg 9 line 9-10). The government was aware the evidence "is directly related to the crime charged, because it highlights defendants motive and intent" (Gov.'s motion...other public officials pg 9 line 23). The government knew "documents, testimony, and records concerning petitioners contact with other public officials [was] relevent to show motive, intent, preparation, [and] plan...; [that the] evidence provides material support for the position that defendant intended to...send...messages to public officials...to engage in such conduct...with official duties" (Gov.'s motion...other public officials pg 13 line 3-20).

Still during trial the government withheld all this evidence from the jury. The government meticulously presented exhibits that showed petitioner only contacting Judge Rahill despite plenty of emails existing that showed petitioner contacting Judge Rahill and other officials in the same email. The government deliberately withheld the fact that petitioner sent more emails in total number with the same content to Judge Patti, Prosecutor Butler, and Clerk Smith than to Judge Rahill. Despite this knowledge of contact with other public officials, the government in its closing argument told the jury that the petitioner "didnt target the whole judiciary, but fixated on a single judge".

The decision to close the trial with this claim was no mistake. It was a calculated move to nullify the jury and cause them to confuse the issue of whether the petitioners conduct fulfilled the cyberstalking statute by targeting the specific individual that basically every court of appeal ruled is required for the cyberstalking statute to apply. "Trial courts have the duty to forestall or prevent such conduct" (Gov.'s motion...to exclude evidence 2:23-cr-00491-FLA Document 58 pg 3 line 25). Courts should exclude evidence and arguments which only seek to nullify the jury. See Zal v. Steppe, 469 F.2d 924, 930 (9th Cir.) 1992 (Trott J concurring). "'[N]ullification is, by definition, a violation of the jurors oath to apply the law...United States v Lynch, 903 F.3d 1061, 1079 (9th cir. 2018)" (Gov.'s motion...evidence Doc. 58 pg 5 line 3-4).

Jury nullification is exactly what the prosecution's presentation achieved. With the district courts blessing, the government proffered its evidence against the petitioner so that the jury thought the petitioner had a fixation on one person and was targeting one person, stalking, rather than "a fixation on targetting public Officials" (Gov.'s motion...other public officials Doc. 57 pg 12 line 6) and an entire branch of the government, conduct which no statute criminalizes if the communications do not amount to "true threats".

Whether the petitioner fixated on one judge as the government tried to pretend in trial, or he contacted many government officials with the same sort of communications is highly relevant. The governments arguments and exhibits were by design intended to mislead the jury so that they were confused about the issue of whether or not the defendant stalked an "individual". The jury asked the court during deliberations to define "a legitimate purpose". It is not unreasonable to consider if the jury might have thought that communicating to group of judges amounted to the legitimate purpose of protesting, but that "fixating" on one judge did not amount to the legitimate purpose of protesting.

The government improperly influenced the petitioners trial by misleading the jury into thinking that the petitioner fixated or targeted one judge over the other officials he communicated to. Such a claim potentially invoked the jury's personal sympathies. A person would experience distress very differently if instead of being the only person in their office to receive repeated, disturbing communications, their whole office received similar communications. A jury at least should have been given the opportunity to review the petitioners conduct in full consideration of the fact that the alleged victim was not the only recipient of similar communications. Instead the government got away with misleading the jury because the court removed petitioners right to manage their trial strategy and defense counsel didnt think they were compensated enough to give the effort to present a single exhibit of its own.

If misleading a jury about facts and circumstances of a defendants conduct relevant to the statute charged isnt prosecutorial misconduct, then what is?

TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

---

II. Misdiagnosis of Autism:

1.) Other Psychologists that diagnosed defendant:
From 2020 - 2025, the Defendant was observed in a clinical setting or evaluated by the following practicing psychologists:
A.) Dr. Gessesse - LA Downtown Medical Center Psychiatrist - In December of 2020 Psychiatry staff observed Defendant for 3 days during a period of time he refused to eat. Dr. Gessesse diagnosed defendant Lipman with a major depressive episode and determined defendant not to be a danger to himself or others.
B.) Dr. Hernandez - White Memorial Hospital Psychiatrist- In April of 2020 psychiatric staff and at least a dozen guards observed defendant 24 hours a day, taking notes about defendants behavior every 15 minutes, during defendants 26 day hunger strike. Defendant was diagnosed with a major depressive disorder and allowed to continue hunger strike. If during that continuous observation defendant was suspected of a fixation disorder like autism he would have never been released still on a hunger stike.
C, D, E.) Psychologist's Mehlberger, Hernandez, and Nicklas - Federal Government's Metropolitan Detention Center - From May of 2024 to April of 2025 psychologists in charge of MDC's Psychological housing unit had group therapy sessions with defendant once a week, individual 20 minute therapy sessions once or twice a week, and had supervision of defendant interacting with others 5 days a week. These psychologists are literally the people the federal government employs to assist in or directly evaluate for competency defendants from across the United States when a judge orders a defendant to undergo a competency exam through 18 USC 4241. Though unable to officially diagnose defendant without a court order, each of these psychologists repeatedly expressed doubt regarding defendants autism diagnosis. They were effectively assisting defendant with an anxiety disorder and a depressive disorder. At least one of these psychologists attempted to help defendant deal with Post Traumatic Stress disorder. Their assistance helped manage symptoms.
F.) Psychologist Malinek - Private Forensic Psychologist - examined defendant during a 2 week period in March of 2025. Malinek administered a competency evaluation that was at least three times as extensive as any questionaire BJ Freeman administered. Dr. Malinek observed no signs defendant had autism and joined the above consensus that defendant did not have autism. Malinek diagnosed defendant with a delusion disorder and a depressive disorder.

II.) Misdiagnosis of Autism.
   On May 13, 2025 after a year of requesting access to psychologist BJ Freemans report, Defendant was permitted during jury selection to finally review BJ Freemans psychological report. BJ Freemans psychological report was ridden with errors. Defendant has had multiple long term relationships of 4 years, 2 years, and multiple 1 year relationships. Defendants parents were up until coronavirus supplementing defendants income as life in Los Angeles was expensive and work as a production assistant paid minimum wage below the cost of living. Defendants parents were not his only source of income. Defendant had no problem maintaining professional relationships. Because of socialization skills defendant was rehired by every boss that he ever worked for multiple times.
   Defendant worked in the highly social setting of entertainment production. There were many gigs that saw defendant working with a crew of more than 100 people from different socio-economic conditions and races. Defendant would not have been continually hired to work in entertainment production if he had some sort of issue reading social cues or understanding how people would receive communications. Defendant worked on tv shows. Defendant worked in contact or around multiple celebrities. He never once had to apply for a job. Following his first gig defendant was hired based on referrals. Defendant was never accused of having a deficiency communicating with work peers, background actors, or celebrities.
   Facts stated by BJ Freeman are completely wrong. Defendant does not have an IQ of 150; BJ Freeman would have no idea of what defendants IQ was since she did not give Defendant a comprehensive IQ test if gave any IQ test at all. Defendant in college as a psychology major tested in the 115 to 125 IQ range, which is above average but not an extremely high IQ.
   Defendant was not in the "top of his Bar Mitzvah class". Defendant attended "Hebrew School" for two years. Grades were not assigned. He had 9 other classmates. Defendant went to public school. There was no such thing as a "bar mitzvah class". Jews who attend a religious private school do not call that school a "Bar mitzvah class". They just call it "school". Defendant was not in the top of his college class; his grades in college were average. He likely averaged a B; about a 3.0 GPA. Defendant spent more time hanging out with friends and smoking marijuana than focusing on his grades. In fact most of defendants issues socializing ceased when he left the abusive environment of Lacey Township and his home. He went to film school. His studies required defendant to constantly interact within a group.
   The major problem with BJ Freemans report is that it relied heavily on documentary evidence because of the limitations of an evaluation in an interview room. [This is why the court usually orders a defendant to be evaluated in a specialized setting inside a detention center for a 30-45 day period.] Freeman only interviewed defendant for 3 1/2 hours. She did not interview any of defendants former male or female roommates; some whose names were provided to then attorney Koury to contact. Instead of talking to people who had recently interacted with Defendant Lipman or interviewing co-workers, BJ Freemans documentary evidence relied on one person, the defendants mother Susan Lipman.
   Defendant and mother Susan Lipman at the time of her interview were estranged completely for 7 years. Defendant had for two decades accused Susan Lipman of being emotionally and verbally abusive to him. Contemporaneous emails and text messages would show that defendant Lipman accused his mother of longterm emotional abuse and attributed to this abuse an

TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

---

anxiety/depressive disorder. Susan Lipman was the wrong person to base a documentary report on. She would have latched onto and attempted to confirm any diagnosis that excused her from emotionally damaging her son. Lipman moved away from home at the age of 19 in 2008 and spent only two more summers living with his mother. He then cut her out of his life nearly completely.

Most claims made by Susan Lipman are misleading or inaccurate. The primary reason Susan Lipman thought defendant had a lack of relationships and relationship problems was that the defendant did not share these details with her. Relying on defendants mother for a documentary analysis was beyond malpractice considering defendant stopped informing her about his relationships in 2015 and he had roommates available to discuss how he socialized with them.

BJ Freemans testimony on May 15th was also problematic. BJ Freeman was at the time of the evaluation in 2024 an 80 year old living in a nursing home. Though she required no physical assistance, she still needed some sort of assistance and if her testimony is to be considered honestly, she likely suffered some sort of mental deficiency that was not unusual for an 80 year old but still left her with a diminished capacity professionally.

BJ Freeman had trouble recalling basic facts. She could not recall the circumstances that led her to evaluate defendant. She could not recall case specific information of defendant. BJ Freeman relied on generalities about autism rather than case specific observations of defendant or his history. Geriatric psychology notes that often one of the first signs/symptoms of what the laymen call senility, is problems with short and midterm memory recall.

A person with dementia or alzheimers or another disorder of advanced aging would have difficulty recalling new details and recent events. A person with geriatric struggles might have an easier time recalling memories from 1976 or 2008 than 2024 despite the fact that 2024 was more recent. That person would have an easier time recalling academic knowledge they practiced and repeated for 30 years, than facts and details they learned from brief interactions in 2024 with a person they evaluated for 3 hours over a 2 day period. BJ Freeman was also confused by questions asked of her during her testimony. Its worth noting an assistant wrote her reports and that likely effected her recall as well.

Its worth noting a few other things. BJ Freeman and a juror of a child with autism pointed out that autism is not a "mental illness". This is probably why every single case in which autism comes up as a potential obstacle to a defendant managing their defense in pro-se, every circuit allows defendants to continue to represent themselves. [In U.S. v Telles 2021 the court denied defendant right to pro-se defense not because of autism, but because pro-se was used as a delay tactic.] BJ Freeman also testified and her report makes clear, that she did not conduct a competency evaluation of defendant. The report also notes that defendant could be suffering from the "neurological disorder" autism and another mental illness like PTSD. Her diagnosis, valid or invalid, did not meet the mental illness requirement to exercise 18 USC 4241 or remove defendants pro-se rights. Its entirely possible that Defendant Lipman didnt have autism or did have autism and that he also suffered from, as Dr. Malinek Diagnosed him with, a delusional disorder rendering him incompetent to stand trial and incompetent to be sentenced, a violation of Defendants due process rights.

Its also worth noting the liklihood that BJ Freeman suffered from Confirmation Bias. BJ Freeman was specifically hired to confirm attorney Kourys accusation defendant had autism. Defendants mother claimed that she believed defendant had autism or borderline personality disorder. BJ Freeman informed defendant she was sure he had autism before even speaking to him. BJ Freeman performed the evaluation already believing that defendant suffered from autism. She told defendant that she could stop administering multiple tests before they were completed because of her preconceptions. The court never reviewed these tests or compared their findings to other autism reports. The district court simply took Freeman at her word despite the fact she had not been a "practicing" autism specialist since 2008 and only conducted autism evaluations part time.

III.) Ineffective Counsel:

On March 25th, 2024 standby counsel Joel Koury specifically accused defendant Jonathan Lipman of autism to be able to exercise 18 USC 4241. He didnt claim a general concern for competence. Koury hired an 80 year old autism specialist BJ Freeman, who at one time was well respected, but by the time of her diagnosis of defendant had not worked in autism in decades, and was living in a nursing home because she required assisted living despite no physical maladies. Psychologist BJ Freeman confirmed in her testimony on May 15, 2025 that she was not hired to conduct a competency evaluation and that she did not conduct a competency evaluation of defendant Lipman.

From March 26th to April 20th, 2024 Defendant went on a 26 day hunger strike. In response to this hunger strike Metropolitan Detention Center Staff threatened to beat defendant and pepperspray defendant into eating, defendant was locked in a room without a book to read for 30 days, defendant was chained to a hospital bed for 9 days, defendant was assaulted by a corrections officer to the point he bled for attempting to push a food tray out of his cell, defendant was denied a shower for 21 days, and defendant was denied the ability to send mail, call his father, or send emails. Defendant was also left bleeding in his cell for 24 hours requiring stitches as staff ignored his requests for medical attention. To end this hunger strike the bureau of prisons falsely accused the defendant of a crime and informed him that the accusation would go away and be expunged from his record if he started eating. The circumstances by which the federal government attempted to end defendants hunger strike had a tremendously negative psychological effect on defendant. Defendant believed it triggered his PTSD as it still causes him nightmares. Being locked in a room without any stimuli for 30 days or chained to a hospital bed conscious, but unable to move changed defendant. Its entirely possible it left him with signs that were mistaken for autism in a detention center interview room.

TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

---

Attorney Koury was made aware of the response to defendants hunger strike but did nothing to protect defendant from damaging interventions and ignored claims that the response to his hunger strike altered defendants personality. Throughout most of May and June defendant requested in accordance with 18 USC 4241 et seq. to have a secondary evaluation done by someone who wasnt only testing defendant for autism. The request was denied. Defendant also requested the right in accordance with 18 USC 4241 to question psychologist BJ Freeman or submit questions to be answered by BJ Freeman either in writing or underoath during the competency evaluation. Defendant also requested that his evaluation in accordance with 18 USC 4241 to be recorded on audio or video. These requests were also ignored and denied. There are contemporaneous communications of these requests between attorney Koury and Defendants father.

On or about June 27 and 28th, Psychologist BJ Freeman evaluated defendant in a detention center visitation room. Defendant having worked as an Emergency Medical Technician in a county in America with one of the oldest populations demographically in the U.S., observed signs that BJ Freeman was suffering the effects of advanced aging. Despite her report, she did not possess the patience or willingness to complete most tests she was administering to defendant. She often rambled that she had seen enough halfway through a test and ended them. Freeman took few notes and claimed that her assistant wrote her reports from her spoken recollection. At times she got confused and she was unable to recall how to work her stopwatch despite the fact that she would likely need the stopwatch every time she administed an autism diagnosis. [How many examinations has BJ Freeman given in the last five years!?] Freeman often lost her train of thought. There are contemporaneous notes written at time of evaluation where defendant questioned whether or not BJ freeman was suffering from an age disorder. Defendants attorney hired a specialist that looked good on paper, but did not confirm at 80 years old she was still capable of an evaluation.

BJ Freeman in her evaluation claimed that defendants lack of animation or expressive body movements was a sign of autism. Defendant attempted to explain to Freeman that detainees were advised by prison staff to refrain from expressive nonverbal communication or hand movements and that being locked in a room or chained to a hospital bed had moderated defendants nonverbal behaviors but she disregarded this explanation. When Defendant brought to attorney Koury's attention that BJ Freeman's evaluation may have been effected by her mental or psychological state, the claim went unaddressed.

From July to October of 2024, Defendant Lipman attempted to get Attorney Koury to subpoena the government for return of defendants harddrives, which had contemporaneous notes and documents related to defendants intent to protest, and that had a video of the LAPD examining the object in the photo that the government claimed was a gun, which the LAPD determined not to be a weapon but a trophy. Defendant asked Attorney Koury to subpoena/depose law enforcement agents in NJ that defendant contemporaneously informed his intent was not to harass anyone but to protest the government as a whole. Defendant asked attorney Koury to subpoena the LAPD for body camera footage of welfare checks of defendant. Defendant asked Attorney Koury to visit him to discuss trial. Attorney Koury ignored all of defendants requests to discuss trial. From March 2024 - October 2024 Attorney Koury visited Defendant two times; each time Koury was unwilling to discuss trial and attempted to coerce defendant into a plea deal.

In October of 2024 Defendants Father hired attorney Daniel Perlman to replace counsel Koury. Defendants father who had originally had a good relationship with Koury had begun to distrust attorney Koury after being told a series of lies. Daniel Perlman allegedly had an undergraduate degree in psychology. After speaking with Defendant during a two hour consultation, Attorney Perlman was convinced that defendant Lipman did not suffer from Autism spectrum Disorder and promised to refute the claim.

Attorney Perlman was hired to negotiate a pretrial diversion and to submit a motion to dismiss for violation of defendants 6th amendment speedy trial rights and the effect of the conditions of defendants detention on his ability to competenly testify to a jury. Perlman was hired with the agreement that if he could not accomplish pretrial diversion he would agrue that defendants right to defend himself pro-se was improperly removed. Attorney Perlman made clear he was not being compensated adequately for trial and would not represent defendant in trial. Perlman convinced defendant to agree to Mark Mcbride as co-counsel "to write motions". The terms of this agreement are confirmed by contemporaneous emails between defendant and attorneys Mcbride and Perlman.

Attorneys Perlman and Mcbride visited defendant 2 times in 2024 to discuss contract and a future secondary evaluation. Defendant during both of these visits attempted to discuss issues of potential trial, but Perlman and Mcbride avoided such discussions and told defendant to focus on evaluation.

Defendants evaluation by Dr. Malinek was scheduled for late December or early January. The evaluation ended up being delayed months without a valid explanation. Defendant suspected and suggested in contemporaneous emails that this evaluation was withheld because the Attorneys Office informed counsel that no psychological defect would convince them to agree to a pretrial diversion.

On February 28th, 2025 Mcbride represented in a hearing that the defense needed a continuance to administer to defendant the psychological evaluation he had agreed to and expected to be performed by January. Counsels performance in this hearing led defendant to consider that counsel was hoping the district court would deny this request for continuance to avoid the evaluation. Defendant agreed to this continuance because he wanted a second psychological report that could report what 5 other practicing psychologists concluded after evaluating defendant for weeks or an entire year: that he didnt have autism.

At some point in February or March when discussions regarding a pretrial diversion agreement with attorneys office failed, Perlman and Mcbride requested to be relieved as counsel due to a lack of compensation. Who this request was submitted to

TRULINCS 79509510 - LIPMAN, JONATHAN - Unit: LOS-H-S

----

and when this request was made, defendant is not sure. Contemporaneous records would show that defendants father was informed by attorneys of their attempts to be removed as counsel and were trying to coerce defendants father into giving them more money.

On March 5th, a week after the court agreed to the final continuance to allow defendant to have the evaluation originally scheduled for early January of 2025, Defendant was evaluated by Dr. Malinek. The delay in evaluation was not a scheduling issue and psychologist was available within a weeks notice. Dr. Malinek conducted another evaluation of defendant on March 19th as well. During the second evaluation , defendant informed Dr. Malinek that he thought his attorney client privileged communications were being surveilled by the Bureau of Prisons. As this allegation was not confirmed, Dr. Malinek mistook this claim for a delusion. [On March 28th the Buerau of Prisons confirmed that defendants attorney client privileged communications were being reviewed following their seizure of defendants legal work product.] Defendant is not sure if Dr. Malinek was informed by counsel that defendants claims of surveillance were accurate to reconsider the diagnosis of delusions that the government was persecuting defendant.

Contemporaneous emails would show that from January 2025 to the case management/competency hearing on April 23rd, defendant requested that counsel Mcbride and Perlman visit defendant to discuss trial, subpoenas, discovery, exculpatory evidence, and witnesses. Attorneys MCbride and Perlman did not meet with defendant a single time. Counsel responded to 3 emails defendant sent during this time.

On April 23rd attorneys McBride and Perlman submitted a motion based on Dr. Malineks report seeking the court to find defendant incompetent to stand trial. The court rejected Malineks evaluation, the only competency evaluation defendant received, and stated to the record that the defendants case needed to be tried upon the question of whether or not autism impacted defendants ability to inform intent.

Attorney Perlman visited defendant 2 times before trial for a total of 2 hours; once April 26th and once on May 12th. Attorney Mcbride never visited with defendant. Attorney Perlman refused to discuss trial strategy, discovery, exhibits, witnesses, and gave no indication he effectively prepared. On april 26th defendant and Perlman discussed the story defendant wanted the jury to know through testimony about his conduct. [Counsel did not share this story in trial.] The may 12th visit was primarily spent on defendant trying on the clothes he would wear at trial. During these meeting Perlman noted that when he spoke to Freeman on the phone she "sounded drunk". Defendant told Perlman multiple times he thought Freeman was senile and asked counsel to investigate before calling her as a witness.

In the May 1st pretrial hearing, defense counsel attempted and failed to get the court to permit the defendant to offer testimony in narrative form rather than as question and answer. Attorney Mcbride in this hearing while arguing admissability of voicemail exhibits, admitted that he was hearing for the first time in this hearing evidence that was the governments "exhibit 4" since March 2024; an exhibit that defendant mentioned to attorneys would come up in a hearing. Attorneys throughout pretrial made numerous comments on record that they did not prepare and were improvising the defense.

Defense counsel demonstrated little preparation for trial. They clearly sought to have the trial be as short as possible due to unhappiness with the compensation they had received. Despite defendant submitting a list of questions for witnesses and attempting to share discovery that demonstrated relevance of those questions, defendants attorneys asked few questions and asked some witnesses no questions. Attorneys McBride and Perlman wrote their opening and closing statements during trial. During Freemans testimony defendant pointed out to counsel her errors. Counsel refused to explore these errors because they were afraid that the jury would realize BJ Freemans testimony was unreliable and they wouldnt believe counsel's singularly focused autism defense.

During trial May 15th 2025 defendant informed his attorneys that he was going to testify. During a short recess before this testimony, Mcbride and Perlman informed defendant they had not prepared for defendants testimony and they had not written down any questions to ask defendant in testimony. Counsel told the defendant that if he wanted to testify he would have to use the short recess in which he was placed into a cell without a pen or paper, to come up with the questions his attorneys would ask him during his testimony when the recess ended in 15 minutes. This triggered some sort of psychological stress reaction in defendant. Under duress and because of counsels failure to prepare for defendants testimony, defendant felt he had no choice but to inform the court he could not testify due to his state of mind at that time.

Attorneys McBride and Perlman defense lasted approximately 45 minutes. They prepared no exculpatory evidence despite the hundreds of communications in which defendant stated that he was protesting the entire judiciary of NJ. Defense counsels only witness was hired by former counsel Koury and paid for by the government. Emails would show that counsel rejected defendants request for other witnesses due to expenses. Defense counsel prepared for only one strategy; that autism rendered the defendant incapable of intent, despite the fact they expressed numerous times in contemporaneous emails and on the record that they did not actually believe the defendant suffered from autism. Defense counsel did not prepare for the eventuality that psychologist Freeman would demonstrate symptoms of a geriatric psychological condition that would render her testimony unbelievable or ineffective. Defendants attorneys were so unprepared for their own autism defense, that a juror had to explain to them autism was not a mental illness after their claim it was in argument offended her enough to quit the jury.

Jonathan Lipman 79509-510
Metropolitan Detention Center Los Angeles
P.O. Box 531500
Los Angeles CA 90053



LOS ANGELES CA 900
3 JUN 2025   PM 8   L

Clerk, U.S. District Court
United States Courthouse
255 East Temple Street Suite TS-134
Los Angeles CA 90012

CN CR

RECEIVED
CLERK, U.S. DISTRICT COURT
JUN - 5 2025
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

90012-330934