KAEDIAN LLP
KATHERINE C. MCBROOM (SBN 223559)
kmcbroom@kaedianllp.com
280 S. Beverly Dr. Ste. 209
Beverly Hills, CA 90212
Telephone: (310) 893-3372
Facsimile: (310) 935-0323

Attorney for Defendant
JONATHAN LIPMAN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN LIPMAN,<br><br>Defendant. | Case No.: 2:23-cr-00491- FLA<br><br>*Before the Hon. Fernando L. Aenlle-Rocha*<br><br>**DEFENDANT JONATHAN LIPMAN'S SENTENCING MEMORANDUM**<br><br>Date:   October 3, 2025<br>Time:   11:00 a.m.<br>Court:  6B |

To The Honorable Fernando L. Aenlle-Rocha, United States District Judge; The United States Attorney's Office and Its Attorneys of Record; Assistant United States Attorneys Daniel Weiner and Clifford Mpare; United States Probation Officer Shani Kochav; and/or her representatives:

Defendant Jonathan Lipman, by and through counsel, hereby files his Sentencing Memorandum.

Dated: September 18, 2025

*Katherine C. McBroom*
KATHERINE C. MCBROOM
Attorney for Defendant
JONATHAN LIPMAN

1

DEFENDANT JONATHAN LIPMAN'S SENTENCING MEMORANDUM

## SENTENCING MEMORANDUM

### I. INTRODUCTION

Years ago, Defendant Jonathan Lipman ("Mr. Lipman") suffered bullying and rampant antisemitism while growing up and attending public school in Lacey Township, New Jersey. In recent years, Mr. Lipman requested that the Lacey Township school district and law enforcement investigate and acknowledge the abuse he suffered. Dissatisfied with Lacey Township's response and lack of accountability, Mr. Lipman decided to protest in the form of multiple emails and phone calls to school district attorneys, administrators, and law enforcement officers. Ultimately, Mr. Lipman's communications resulted in the Lacey Township Police Department requesting a wellness check of Mr. Lipman at his Los Angeles home and petitioning the Ocean County, New Jersey Superior Court for a temporary emergency risk protective order against Mr. Lipman. On January 31, 2023, Ocean County Superior Court Judge, victim K.R., granted a permanent emergency risk protective order prohibiting Mr. Lipman from owning or possessing a firearm. Mr. Lipman regarded the judge's act of granting the petition as complicity with Lacey Township's efforts to hide years of antisemitism and racism in its community. He responded by sending hundreds of communications, in the form of emails, phone calls, and voice messages to several members of the judiciary, law enforcement, and Lacey Township school district. Mr. Lipman's communications to K.R. are the subject of this case.

On May 15, 2025, a jury convicted Mr. Lipman of cyberstalking K.R. in violation of 18 U.S.C. §§ 2261A(2)(B). Among other things, the jury considered several of Mr. Lipman's voicemails and emails and K.R.'s testimony as to how there communications affected her. While Mr. Lipman is steadfast that his communications were meant as a protest and that he crafted his language to comport with his understanding of First Amendment protections, he acknowledges and regrets the anguish he caused K.R. He is deeply sorry for the harm he caused.

As of the date of his October 3, 2025 sentencing hearing, Mr. Lipman will have

been in custody for over 24 months. Given Mr. Lipman's lack of criminal history, his struggles with mental health, his openness to treatment, and his difficult upbringing, Mr. Lipman requests a sentence of time served.  Mr. Lipman cannot access the care he needs in custody given the BOP's limited resources and staff shortages. Mr. Lipman's symptoms would be better addressed in the community, including regular one-on-one therapy and vocational training. A 24-month time-served sentence will satisfy the aims of sentencing in this matter and will comport with sentences imposed on similarly situated defendants in the Central and Southern Districts of California.

## II. OBJECTIONS TO THE PRESENTENCE REPORT

The Presentence Report states a total offense level of 28, including a four level increase for two or more aggravating factors under USSG § 2A6.2(b)(1) and a six level increase because the victim was a government officer/employee under USSG § 3A1.2(b).  Probation further determined that Mr. Lipman is in Criminal History Category I but declined to apply the two point zero-offender reduction based on findings that Mr. Lipman used "violence or credible threats of violence" pursuant to USSG § 4C1.1(a)(3) and possessed a firearm pursuant to USSG § 4C1.1(a)(7) in connection with the offense.

### A. Mr. Lipman Objects to a Four Level Increase Under § 2A6.2(b)(1)

Probation argues that because the offense involved "possession, or threatened use, of a dangerous weapon" under USSG § 2A6.2(b)(1)(D) and Mr. Lipman engaged in a "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim" pursuant to USSG § 2A6.2(b)(1)(E), a four level increase is warranted. Probation is wrong.  USSG § 2A6.2(b)(1)(D) is not applicable to this case.

#### 1. Mr. Lipman Did Not Possess or Threaten to Use a Dangerous Weapon

Probation claims the "dangerous weapon" offense characteristic under USSG § 2A6.2(b)(1)(D) applies based on an email sent to K.R. which included a picture of what appears to be a firearm.  Probation's analysis, however, omits the subject line of the

3

email which states, "Is a photo illegal?" Additionally, Probation failed to provide context to the email. As elicited at trial, Mr. Lipman sent this email the day after K.R. granted Lacey Township Police Department's petition for a permanent emergency risk protective order against Mr. Lipman, forbidding Mr. Lipman from owning or possessing firearms. Further, law enforcement did not seize or discover any firearms upon searching Mr. Lipman's home. There is no evidence that Mr. Lipman had previously owned or possessed a firearm or that he owned or possessed one after the petition was granted.

Given the language and timing of the email, Mr. Lipman appears to inquire whether a photograph of a firearm, as opposed to possession of an actual firearm, is prohibited by the protective order. While the email alarmed K.R., Mr. Lipman did not physically threaten K.R. with a dangerous weapon, nor did he threaten to assault her with the object depicted. A picture of what appears to be a firearm, in this context, does not amount to "possession, or threatened use, of a dangerous weapon" as set forth under USSG § 2A6.2(b)(1)(D).

Ninth Circuit case law concerning the use of a dangerous weapon under USSG 2A2.2 in aggravated assault cases is instructive. The Court has emphasized consideration of both the object used and the intent behind its use. In *U.S. v. Dayea*, 32 F.3d 1377 (9th Cir. 1994), the court noted that the use of the object must be rationally related to the defendant's culpability and intent to achieve a particular purpose. *Id.* at 1380. In *Dayea*, the defendant pleaded guilty to voluntary manslaughter and aggravated assault stemming from a driving under the influence accident. At issue was whether the defendant used or threatened to use a motor vehicle as a weapon. *Id.* at 1381. Because the defendant did not intend to harm the victim with the vehicle, the specific offense weapon enhancement was not applicable. *Id.* In *U.S. v. Goodbear*, 676 F.3d 904 (9th Cir. 2012), the defendant pleaded guilty to assault resulting in substantial bodily injury in a child abuse case. At issue was whether a belt used to the strike the child was a "dangerous weapon." *Id.* There, the court determined the belt to be a dangerous weapon

based on the manner in which it was used and the defendant's intent to harm or injure. *Id.* at 909-10. Here, Mr. Lipman did not possess a weapon but rather sent a picture of what appeared and was never determined to be a weapon with the title, "Is a photo illegal.?" There is no evidence that Mr. Lipman threatened to harm K.R. with the object depicted in the photo or that he actually possessed a firearm at any time.[1]

Mr. Lipman's case is distinguishable from Ninth Circuit cases wherein the court determined a dangerous weapon enhancement applied despite the defendant not actually possessing a weapon at the time of the offense:

In *U.S. v. Michael*, 220 F.3d.1075 (9th Cir. 2000), the court upheld a dangerous weapon enhancement where the defendant held a black object which he claimed was a gun (the object turned out to be a cellphone) in the victim's back and ordered the victim to get out of the car. *Michael* stated, "whether an object constitutes a dangerous weapon depends more on the object's ability to incite fear and violence because it appears to be dangerous than on its latent capability." *Id.* at 1076 [emphasis added]. The object here was depicted in an email with a subject line of "Is a photo illegal?" Additionally, Mr. Lipman was nowhere near K.R. at that the time.

*U.S. v. Faulkner,* 952 F.2d 1066 (9th Cir. 1991) considered whether possession of toy gun qualified as a "dangerous weapon." There, defendant used a toy gun to threaten victims during serval robberies. *Faulkner* ruled that under USSG § 1B1.1, a toy gun is a "dangerous weapon" subjecting the robbery defendant to enhancement. *Id.* at 1073.

In *U.S. v. Chee,* 110 F.3d 1489 (9th Cir. 1997), the court ruled an enhancement appropriate in an assault case where defendant threatened that he possessed a deadly

---

[1] It is worth noting that the Government specifically chose not to pursue charges against Mr. Lipman for interstate threats. In Case No. 2:23-mj-00491-FLA, the Government initially charged Mr. Lipman with threat by interstate communication in violation of 18 U.S.C. § 875(c).[ECF 1] The Indictment charges Mr. Lipman, instead, with stalking in violation of 18 U.S.C. 2261A(2)(A) and (B). [ECF 12]. Ultimately, the Government proceeded under a theory that Mr. Lipman violated 18 U.S.C. § 2261A(B) only – that Mr. Lipman engaged in conduct with the intent to harass and intimidate K.R. and caused K.R. emotional distress. [ECF 159 at p. 4]. The Government has not alleged nor proven (by any standard) that Mr. Lipman placed K.R. in reasonable fear of death and seriously bodily injury pursuant to 18 U.S.C. § 2261(2)(A) nor that Mr. Lipman threatened K.R. pursuant to 18 U.S.C. § 875(c).

weapon even though he did not. There, defendant confined the victim to a vehicle and threatened to kill her with a gun, even though he did not possess a gun or other dangerous weapon. *Id.* at 1491. *Chee* confirmed that the threat of the use of the weapon, regardless of whether defendant possessed a weapon justified a dangerous weapon enhancement. *Id.* at 1493-94. Unlike the defendant in *Chee,* Mr. Lipman did not directly threaten, confine, or physically assault K.R. He inquired whether the photo depicting a firearm was illegal.

In *U. S. v. Ehmer*, 87 F.4th 1073 (9th Cir. 2023), the court considered whether the use of gun was threatened in connection with an obstruction/impeding officers charge. *Ehmer* stated, ". . .a 'threat' is generally understood as a communication, by words or actions, that a reasonable person would foresee would be interpreted by its targets as 'a serious expression of intent to harm or assault' and that is made with the requisite scienter. *Id.* at 1140 [internal citations omitted]. There, defendant visibly displayed a firearm in a watchtower during a well-publicized occupation intended to prevent anyone other than occupiers from entering or exiting. *Ehmer* concluded that, although the officers were not physically onsite to see defendant displaying the firearm, it not dispositive as the display was highly publicized. *Id.*

Mr. Lipman's case is distinguishable from each of those described above. In each of these cases, the defendant directly threatened the victim with an object or weapon and had the present ability to use the weapon threatened. Here, Mr. Lipman did not threaten K.R. in person, threaten K.R. with the weapon via email, nor did he have the immediate, present ability to harm K.R. with a weapon. The mere act of sending a photograph of a prop firearm, while certainly disturbing, does not constitute possession or threatened use of a dangerous weapon.

### 2. The Enhancement for A Pattern of Activity Against the Same Victim Should Not Apply

Mr. Lipman was convicted of the using the internet, mail, and phone lines, with the with the intent to harass or intimidate K.R. and, in doing so, causing or attempting

to cause emotional distress to K.R. The Government admitted into evidence and relied upon multiple emails to K.R., in other words a pattern of harassing emails to the same victim, to secure the conviction. Under these circumstances, application of the 2A6.2(b)(1)(E) is impermissible double counting. Mr. Lipman's act of repeatedly emailing K.R. is subsumed in the charge for which he was convicted – cyberstalking K.R.

> Impermissible double counting "occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Reese*, 2 F.3d 870, 895 (9th Cir. 1993). Therefore, impermissible double counting occurs either when a human error is made in the mechanical application of the Sentencing Guidelines, or, perhaps, if and when the Guidelines inadvertently require an impermissible result.

*U.S. v. Nagra*, 147 F.3d. 875, 883 (9th Cir. 1998); *see also U.S. v. Syrax*, 235 F.3d 422, 423 (9th Cir. 2000).

Should the Court disagree and determine that an aggravating factor for a pattern of harassing K.R. is applicable, the defense poses that the resulting offense level overstates the conduct at issue and requests the Court exercise its discretion in granting a downward variance from the recommended sentencing range.

### B. Mr. Lipman Objects to Probation's Election Not to Apply the Two-Point Zero Point Offender Decrease

Probation claims that because Mr. Lipman used credible threats of violence in connection with the offense and/or possessed a dangerous weapon in connection with the offense, Mr. Lipman is not entitled to a two-level decrease under USSG § 4C1.1. Mr. Lipman did neither.  Probation is wrong.

As for the gun possession, an emailed photograph of what appears to be a firearm does not amount to possession of a firearm.  There is no evidence that Mr. Lipman possessed a firearm at any time before or after the protective order petition was granted.

That leaves the issue of "credible threats of violence." The defense concedes that communications admitted into evidence at trial make mention of K.R.'s death. Most concerned K.R.'s death by sickness or disease. While concerning and certainly distressing to K.R., Mr. Lipman did not use violence, nor did he make "credible" threats of violence against K.R. The evidence admitted at trial included:

- A photo of what appears to be a firearm with a subject line stating, "is a photo illegal?" sent the day after the emergency protective order was issued.
- A voicemail/call stating that "It's a shame there are kids that get shot up in schools instead of you people."
- Emails and/or written communications stating, among other things, that he hopes K.R. dies a slow and painful death from disease, that People will know K.R.'s name, that he hopes K.R. suffers like those who died in the holocaust, and that he hopes K.R. dies of a painful natural death.
- An email about resurrected United States forefathers killing K.R.

While distressing, Mr. Lipman did not personally threaten to hurt K.R. nor did his emails or other communications make credible threats of violence. *U.S. v. Bauer*, 714 F.Supp.3d 1 (D.C. Columbia 2024), a District of Columbia case ,is instructive as to the meaning of "credible threats of violence." There, the court determined whether a January 6, 2021 rioter was ineligible for a two point zero offender reduction where she threatened Speaker Nancy Pelosi and shoved a police officer who was trying to secure the Rotunda. *Id.* at 4. *Bauer* determined that indeed the defendant did use violence when shoving a police officer and did make credible threats when she demanded that U.S. Capital Officers bring forward members of Congress, including Nancy Pelosi and screamed things like "they need to hang," "bring that fucking bitch out here and "we want Nancy Pelosi." *Id.* at 5. The Court stated that such threats were "credible" given the context in which they were made. *Id.* at 6. Specifically, at the time, Ms. Bauer was "joined by many rioters who had crossed police lines into a restricted area and had even forced officers to temporarily retreat. . .her loud and vehement calls for violence

encouraged other rioters to pick up the call and added to the danger of a dynamic situation." *Id.*

In *U.S. v. Pineda-Duarte*, 933 F.3d 519 (9th Cir. 2019), the court evaluated "credible threat of violence" in connection with a drug offense. USSG § 2D1.1(b)(2) calls from an increase where the defendant used violence or made "credible threats to use violence." *Id.* at 522. There, probation recommended a two level increase, stating that defendant's act of swinging a shovel at an officer was use of violence, a credible threat to use violence, or directing the use of violence. *Id.* at 521. The Court determined that whether the defendant used violence in swinging a shovel depended on his intent and remanded the matter back to the district court for a determination of this issue. *Id.* at 252. As for whether the conduct amounted to a "credible" threat of violence, the court determined it did not. *Id.* at 522. There was no evidence the defendant vocalized or otherwise expressed his intent to injure the officer. *Id.*

Here, Mr. Lipman made disturbing, but passive and at times fantastical statements wishing K.R.'s death. Mr. Lipman did not personally threaten to physically harm K.R. nor did he make credible threats to hurt her. Because Mr. Lipman did not possess a firearm in connection or make credible threats of violence in connection with the offense, Mr. Lipman is entitled to a two-point zero-point offender reduction in this case.

### C. Mr. Lipman Objects to Proposed Conditions of Probation and Supervised Release

The Presentence Report includes the standard conditions of supervision as set forth in the Second Amended General Order No. 20-04. Mr. Lipman objects to condition I.10 which forbids the purchase, possession, and use of any controlled substance or any paraphernalia related to such substances except a prescribed by a physician. In the past, Mr. Lipman has used marijuana medically to effectively treat his depression. Daily marijuana use significantly improved Mr. Lipman's mental and physical health, quelled feelings of anger and anxiety, and assisted in difficulties with

social connections and interactions. Accordingly, Mr. Lipman requests that condition I.10. be modified to allow for use of marijuana.

### III. STATEMENT OF FACTS

#### A. Mr. Lipman's Childhood and Adolescence

Mr. Lipman was born on April 8, 1989 in Redbank, New Jersey to Marc and Susan Lipman. He is the first of two children. Mr. Lipman's sister is one year younger than he. Mr. Lipman's mother was diagnosed with Lyme disease during the 16th week of pregnancy with him. She recalls being quite ill throughout the pregnancy.

To this day, Mr. Lipman and his mother have a strained relationship. Mr. Lipman reports that his mother both emotionally and psychologically abused him throughout his childhood. Mr. Lipman's first memory of abuse is from infancy. He recalls his mother shaking him. He suspects his mother suffered from post-partum depression and resented him for not providing her the happiness she expected from motherhood. Mr. Lipman recalls his mother telling him that she had nearly aborted him and wished she had. He also recalls that she would feign illness or convince Mr. Lipman he was ill to punish or guilt him. On one occasion, his mother convinced him that he had contracted rabies, which he believed for several days. On another occasion, his mother told him she had been diagnosed with cancer after getting into an argument with him. Evidently, she feigned the cancer diagnosis to evoke guilt and sympathy.

Mr. Lipman's relationship with his father is a bit more stable. Currently, Mr. Lipman speaks with his father daily.

Mr. Lipman spent a good deal of his childhood in Lacey Township, New Jersey. Unfortunately, at that time, Lacey Township experienced rampant racism and antisemitism. Starting at about age seven, Mr. Lipman recalls being bullied relentlessly. He was the victim of antisemitism at his public school as well as in his Lacey Township neighborhood. The bullying included hate speech and physical violence. He recalls individuals telling him that they wished he had died in the Holocaust and that they fantasized about him suffocating in a gas chamber. Further, he endured any number of

Anti-Semitic slurs. It was not just students who bullied Mr. Lipman. He recalls school administrators and teachers making antisemitic comments and failing to take appropriate measures to address his classmates' behavior.

Unfortunately, Mr. Lipman received little to no support from the adults in his life, including his parents. In fact, Mr. Lipman recalls that his mother became annoyed and concerned that Mr. Lipman's reporting the bullying would have a negative impact on her relationships with the neighbors and friends in the area.

The antisemitism and bullying continued through high school. Mr. Lipman believed, and still believes, that the Lacey Township public school district not only failed to address rampant antisemitism but endorsed it. As a teenage boy, Mr. Lipman attempted to bring broader attention to these issues. In 2007, Mr. Lipman started using the local Lacey Township public access television station to expose and discuss the abuses in the city and public schools. Soon thereafter the city terminated the school's access to the network and openly blamed Mr. Lipman for the shutdown. Mr. Lipman's efforts to protest and bring attention to rampant anti-Semitism were thwarted.

Thereafter, Mr. Lipman was threatened for attempting to uncover antisemitism in the community. On one occasion in 2008, a student made antisemitic remarks to Mr. Lipman and held a knife to his throat in front of a teacher. The school did nothing to protect Mr. Lipman and failed to contact law enforcement or to provide Mr. Lipman with any psychological counseling. Rather, the school quietly expelled the student responsible.

Unfortunately, Mr. Lipman also experienced antisemitism outside of school. He was ostracized by members of the community. He feels he was tokenized and singled out. Worse, his attempts to defend himself often resulted in physical violence. As a coping mechanism, Mr. Lipman kept to himself after school. He isolated himself at home, avoiding social encounters. Due to years of bullying, Mr. Lipman to this day finds it very difficult to trust others and to make meaningful social connections.

**B. Education**

Mr. Lipman is bright. In first grade, Mr. Lipman was placed in classes for gifted children. He excelled in school. In middle school, he was the at the top of his bar mitsvah class. He graduated from Hofstra University in 2012 in the top 3% of this class.

While Mr. Lipman performed well academically, he was less successful socially. Mr. Lipman was a quiet child, who experienced difficulty making and maintaining friendships. This was largely due to the bullying and antisemitism he endured.

During his final year or so at Hofstra, Mr. Lipman had some successful forming a handful of meaningful relationships, both platonic and romantic.

### C. Employment

In 2014, Mr. Lipman moved to Los Angeles to pursue a career in the entertainment business. He worked as a field production assistant on *American's Next Top Model*, a reality tv show. From there, Mr. Lipman received other job offers in reality television. However, he struggled with aspects of the reality tv world, including the waste involved. Specifically, he became frustrated that leftover food would not or could not be offered to unhoused individuals in the surrounding areas.

At the time of his arrest, Mr. Lipman was unemployed and struggling to make ends meets. He was wrestling with depression and dependent on his father to assist with finances.

In the future, Mr. Lipman aspires to be an author and screen writer. He also has a passion for working with and assisting the unhoused community.

### D. Mental Health

During trial, the defense called Dr. B.J. Freeman, a professor emerita of medical psychology at UCLA School of Medicine and founder of the Autism Evaluation Clinic of UCLA. She opined that Mr. Lipman suffers from autism and thus could not have formed the intent to commit cyberstalking.

Mr. Lipman has struggled with mental health throughout his adolescence and recent years. He recalls being suicidal as a child. During childhood, he would fantasize about and feign suicide attempts. Mr. Lipman believes that his suicidal thoughts and

ideation were a defense mechanism and a manner of coping with the constant bullying and threats to his physical safety.

At the time of his arrest, Mr. Lipman struggled with depression. He sought mental health treatment but was limited due to financial constraints. He notes that in-person talk therapy is most helpful and wishes to participate in mental health treatment upon his release.

### E. Mr. Lipman's Conduct While in Pretrial Custody

While in pretrial custody, Mr. Lipman has consistently participated in mental health treatment that is available to him. In the past, Mr. Lipman found individualized, one-on-one talk therapy to be most productive. Due to staff shortages, regular one on one therapy is not available at MDC. He does, however, attend group therapy once a week and has completed several mental health courses including Illness Recovery and Management, Seeking Safety, Emotional Self-Regulation, Mental Health Maintenance, and Breaking the Cycle: Basic Cognitive Skills and Emotional Regulation. Upon his release, Mr. Lipman wishes to continue participating in mental health treatment.

### F. Mr. Lipman's Familial Support & Plans for Reentry

Mr. Lipman's father, Marc Lipman, is in the process of locating and securing a housing location for Mr. Lipman upon his eventual release from custody. Marc Lipman has contacted numerous programs, over 25 in the area. Unfortunately, most post release treatments centers are focused on drug addiction and rehabilitation, not individuals solely suffering from mental health issues. Currently, Mr. Lipman's father is in communication with Sister Theresa from Francisco Homes. She has offered Mr. Lipman temporary housing upon release. On the date of sentencing, the defense hopes to have additional information to share with the Court concerning housing and reentry.

## IV. A TWO-LEVEL REDUCTION IS WARRANTED BASED ON LACK OF ANY CRIMINAL HISTORY

Pursuant USSG § 4C1.1(a), Mr. Lipman is entitled to a two-point reduction in his offense level. As set forth above in Section II, Mr. Lipman has zero criminal history

13

points and meets all of the criteria listed in USSG §§ 4C1.1(a)(2)-(10). Contrary to Probation's opinion, Mr. Lipman did not use credible threats of violence or possess a firearm in connection with the offense.

### V. A TIME SERVED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553

Since the U.S. Supreme Court decision in *United States v. Booker*, 542 U.S. 220 (2005), the guidelines are now advisory and are only one of seven criteria set forth in 18 U.S.C. §3553(a) which a sentencing court is meant to considered. In *Gall v. United States*, 552 U.S. 38, 50 (2007), the Supreme Court stated that a district court "may not presume that the Guideline range is reasonable," but rather "must make an individualized assessment based on the facts presented." A sentence in the advisory Guideline range is not presumed to be reasonable. *Nelson v. United States*, 555 U.S. 350 (2009) (*per curiam*). Instead, the advisory Guideline range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (*quoting* § 3553(a)); *see also United States v. Gardellini,* 545 F.3d 1089, 1091-92 (D.C. Cir. 2008).

Further, the *Gall* Court rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines sentence range. *Gall,* 552 U.S. at 47. Finally, the Court rejected the use of rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified. *Id.*

Accordingly, after calculating the proper offense level under the Guidelines and giving the government and the defense the opportunity to argue for the sentence they believe to be appropriate, the district judge must consider each of the § 3553(a) factors and "tailor the sentence" to fit the circumstances of the case. *United States v. Booker,* 543 U.S. 220, 245 (2005); s*ee also United States v. Smith,* 566 F.3d 410, 414 (4th Cir. 2009); *United States. v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007).

This approach has been adopted by the United States Sentencing Commission in the amendments to the Guidelines effective November 1, 2010. USSG § 1B1.1

recommends that the district courts use a three-step approach to sentencing, which includes: (1) properly calculating the advisory Guideline range; (2) referring to the Guidelines Manual and considering whether the case warrants any departures; and (3) considering the factors under 18 U.S.C. § 3553(a) as a whole to determine if a variance if appropriate.

The Court is respectfully urged to accord all appropriate weight to the mitigating circumstances that are present in this case. These include Mr. Lipman's lack of any criminal history, his social emotional history, his mental health challenges, and his commitment to continuing mental health treatment. Further, the Court should consider the sentences imposed on similarly situated defendants in the Central and Southern Districts to maintain consistency and fairness in sentencing.

### A. Mr. Lipman's Personal History and Characteristics

As set forth above, Mr. Lipman's childhood was challenging. He was bullied relentlessly at school, subject to antisemitic rhetoric, and did not feel his parents provided a nurturing, supportive environment. Mr. Lipman isolated himself which only compounded existing social challenges. While Mr. Lipman's struggles improved somewhat after moving out of Lacey Township, he continued to battle depression, anxiety, and post-traumatic stress disorder.

Currently, Mr. Lipman continues to struggle with mental health challenges but has taken advantage of services and classes available to him while in federal custody. He is learning ways to cope with dysregulation, depression, and anxiety and looks forward to continuing treatment during any further custodial sentence and upon his release. Unfortunately, due to staff shortages and other limitations, the mental health treatment available at MDC, and likely other BOP facilities, is inconsistent and, at times, insufficient to meet Mr. Lipman's needs. Mr. Lipman would be better treated with community-based care, including one-on-one talk therapy.

Mr. Lipman acknowledges that his acts largely stemmed from untreated depression and post-traumatic stress disorder. He is remorseful for causing K.R. fear

DEFENDANT JONATHAN LIPMAN'S SENTENCING MEMORANDUM

and distress and is committed to continuing his care with the support of mental health professionals and his father once back in the community.

### B. Nature and Circumstances of the Offense

Since approximately 2020, Mr. Lipman has attempted to hold Lacey Township school administrators, district lawyers, and Ocean County law enforcement accountable for wrongs he suffered as a child and adolescent. He's posted on social media, made phone calls, left voicemails, and sent hundreds of emails to a number of individuals in Lacey Township and Ocean County he believed either perpetuated racism and antisemitism or denied such misconduct occurred. It was Mr. Lipman's comments on a website, Mediaite, on July 3, 2011 which led Lacey Township Police Department to petition the Ocean County Superior Court for an emergency risk protective order. As the Court is aware, K.R., an Ocean County superior court judge granted a permanent emergency protective order against Mr. Lipman forbidding him to own or possess a firearm.

Mr. Lipman felt that Lacey Township administrators and law enforcement, prosecutors, and Orange County judges had violated his First and Sixth Amendment rights. Accordingly, Mr. Lipman used postings, phone calls, and email communications to protest the violation of his rights. He believed that his communications, while disturbing and offensive, constituted protected speech under the First Amendment to the United States Constitution.

On May 15, 2025, Mr. Lipman was convicted of using email, phones, the internet, and interstate wires in an attempt to cause K.R. emotional distress. While Mr. Lipman maintains that his intent in sending these communications was to protest the actions of the judiciary, law enforcement, Lacey Township, and Ocean County, he acknowledges that he caused K.R. distress. He witnessed her testimony, realizes he caused her anguish, and is remorseful for his conduct.

### C. A Variance to Time-Served is Warranted Based on Mitigating Circumstances and the Factors Set Forth in 18 U.S.C. § 3553(a)(2)-(7)

Mr. Lipman suffers from significant mental issues, issues that would be better treated in the community than in custody. Unfortunately, continued incarceration will only delay Mr. Lipman in receiving the medical treatment he needs. Incarceration is known to worsen symptoms of mental illness. PRISON POLICY INITIATIVE, *Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health,* http://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/ (last visited September 8, 2025). The conditions of incarceration, including disconnection from family, loss of autonomy, boredom, lack of purpose, and unpredictability of surroundings, are linked to negative mental health outcomes. *Id.* "[T]he reality is that time spent in prisons and jails can create a host of collateral consequences that haunt individuals even after release. As the research shows, incarceration can trigger and worsen symptoms of mental illness – and those effects can last long after someone leaves the prison gates." *Id.*

In addition to worsening of mental health symptoms, studies indicate that individuals who have served time in custody are more likely to recidivate than those who have been subject to community based sanctions. (Paul Gendreau et al., *The Effects of Prison Sentences on Recidivism*, Public Safety Canada (1999), https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ffcts-prsn-sntncs-rcdvsm/index-en.aspx.) The longer someone serves time in prison is directly associated with the rate of recidivism. *Id.*

The Court must consider the need for a sentence to provide the defendant with adequate educational or vocational training, medical care, or other correction treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(D). Here, Mr. Lipman can only receive the most effective medical care and treatment in the community. He requires a higher level of care than the weekly group meetings currently available to him. Custody time beyond that already served, will only worsen Mr. Lipman's mental health issues and prolong his access to consistent, sufficient care.

As of the date of Mr. Lipman's October 3, 2025 sentencing hearing, he will have

17

been custody just over 24 months. He acknowledges the harm he caused and his need for mental health treatment and desires to continue participating in treatment to address the symptoms underlying his actions. Effective management of Mr. Lipman's symptoms in the community is essential to lowering the risk for recidivism. Further, a 24 month sentence, particularly for someone who has never been in custody, will adequately deter future criminal conduct and protect the public from future incidents.

### D. A Time Served Sentence is Appropriate When Compared to Similarly Situated Defendants

In determining the appropriate sentence, the Court must consider the need to avoid unwarranted sentencing disparities among defendants who have been convicted of similar conduct and have similar criminal histories. 18 U.S.C. § 3553(a)(6).

Recently, in this district, in *U.S. v. Chase Collins*, Case No. 5:24-cr-00132-WLH, a defendant charged with stalking in violation of 18 US.C. §§ 2261A(2)(A), (B), 2261(b)(5) and threats by interstate communications in violation of 18 U.S.C. § 875(c) was sentenced to time served, amounting to six months, followed by three years' supervised release. Like Mr. Lipman, Mr. Collins had zero criminal history points. Mr. Collins was alleged to have made harassing calls and sent harassing emails to multiple victims, including a law enforcement officer.  Mr. Collins' alleged misconduct included:

- A call to a law enforcement officer wherein Mr. Collins stated, "I'm about to get on a flight from Ontario, California to Indianapolis, Indiana. . . I'm going to kill [victim]. . . I going to [victim's place of work] and I'm going to murder [victim] . . I am going to come there and murder [victim]in her fucking salon shop. Murder her. With my bare hands."  (5:24-cr-00132, ECF 13, Indictment ¶2.f.)
- A post on social media to a law enforcement officer stating, ". . .I am going to take your issued weapon, shoot you in the head and fuck [the victim]."( 5:24-cr-00132, ECF 13, Indictment, ¶ 2.j.)

- Left a voicemail stating, "I just want you to know that you're about to die, okay? . . . You know exactly who the fuck I am, and your (sic) about to die. . . I'm about to catch a Southwest flight. . . and start killing some people, alright." (5:24-cr-00132, ECF 13, Indictment p. 5.)

Mr. Lipman has already served four times the sentence imposed in *Collins*.

Recently, in the Southern District of California, two defendants, both in criminal history category I, were sentenced to time served in similar stalking/threats cases:

In *U.S. v. Shultz*, Case No. 3:24-cr-01602-TWR, a defendant who pleaded guilty to interstate threats in violation of 18 US.C. 875(c), was sentenced to a time-served, three month sentence followed by two years of supervised release. There, defendant was alleged to have threatened Fulton County Georgia, District Attorney Fani Willis. Using YouTube live stream video, the defendant stated, "Fani will be killed like a dog." (3:34-cr-01602, ECF 1, Indictment, ¶ 4.) In a separate live stream video, he stated, "Fani Willis will be dead in 2024. . .Fani Willis your (sic) Dead N-----" and "Fani Willis dead at your home C--- Watch." (3:34-cr-01602, ECF 1, Indictment,¶ 6.) Similar to this case, Mr. Shultz was accused of harassing and threatening a government official and had zero criminal history points. Mr. Lipman has already served 8 times the sentence imposed in the *Shultz* case.

In *U.S. v. McGuire*, Case No. 3:22-cr-01395-TWR, a defendant who pleaded guilty to interstate threats in violation of 18 U.S.C. § 875(c) received a 5 month sentence, followed by three years supervised release. There, defendant threatened to harm United States Senator Charles Schumer.  It is alleged that Mr. McGuire left a voicemail for Mr. Schumer stating, "You can't murder babies anymore you fucking evil pile of shit. If I ever get an opportunity, I'll blow your fucking head off you fucking Jew faggot! You baby killing motherfucker. You are an abomination, you fucking faggot, send some bullets your way, motherfucker!" (3:22-cr-01395, ECF 5, First Amended Complaint, ¶ 8.)  Between June 2019 and April 2021, the government documented numerous threats by Mr. McGuire via telephone and email to numerous

19

DEFENDANT JONATHAN LIPMAN'S SENTENCING MEMORANDUM

members of U.S. Congress as well as a U.S. Capital Police Officer. (3:22-cr-01395, ECF 5, First Amended Complaint, ¶ 10.) Similar to this case, *McGuire* was alleged to have harassed a government official and had zero criminal history points. As of Mr. Lipman's scheduled sentencing date, he will have served nearly five times the sentence imposed in the *McGuire* matter.

A time served sentence of 24 months, followed by a term of supervised release is well in line with similarly situated defendants in the Central and Southern Districts of California.

## VI. CONCLUSION

Mr. Lipman acknowledges the pain and anguish he caused K.R. and is remorseful for his actions. He is also committed to treating and managing his mental health. Since his arrest, he has taken advantage of the limited mental health treatment available to him in custody and looks forward to participating in a higher level of care upon his release. Mr. Lipman respectfully requests that the Court impose a sentence of time served (24 months), followed by a term of supervised release. This sentence is sufficient, but not greater than necessary to achieve the aims of sentencing and is consistent with sentences imposed on similarly situated defendants.

Dated: September 18, 2025                    KAEDIAN LLP

*Katherine C. McBroom*
KATHERINE C. MCBROOM
Attorney for Defendant
JONATHAN LIPMAN