BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
CLIFFORD D. MPARE (Cal. Bar No. 337818)
Assistant United States Attorney
Major Crimes Section
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorney
Transnational Organized Crime Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4962/0813
     Facsimile: (213) 894-6269
     E-mail:    clifford.mpare@usdoj.gov
                daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:23-491-FLA |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: October 3, 2025 |
| JONATHAN LIPMAN, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Clifford D. Mpare and Daniel H. Weiner, hereby files its Sentencing Position as to defendant Jonathan Lipman.

//

//

1

This Sentencing Position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

The government respectfully requests the opportunity to supplement its position or respond to any positions asserted by the defense or the United States Probation and Pretrial Services Office as may become necessary.

Dated: September 19, 2025          Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division


*/s/*
CLIFFORD D. MPARE
DANIEL H. WEINER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**Table of Contents**

**Page(s)**

Table of Authorities..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   DEFENDANT IS CONVICTED OF STALKING K.R..........................1

III.  PSR GUIDELINES CALCULATIONS.....................................4

    A.    Possession, or Threatened Use of a Dangerous Weapon.......4

    B.    Pattern of Activity Involving Stalking, Threatening, Harassing, or Assaulting the Same Victim..................8

    C.    Victim Related Adjustment................................10

    D.    Defendant is Not a Zero Point Offender...................10

IV.   THE GOVERNMENT'S RECOMMENDED SENTENCE IS WARRANTED............13

    A.    Nature And Circumstances of The Offense; History and Characteristics of Defendant.............................13

    B.    Need To Reflect Seriousness of Offense; Promote Respect for The Law; Provide Just Punishment; Afford Adequate Deterrence; and Protect the Public from Further Crimes...........................................14

    C.    Need to Avoid Unwarranted Disparities....................15

    D.    A Three-Year Term of Supervised Release is Just and Appropriate..............................................16

    E.    Restitution..............................................16

V.    CONCLUSION.....................................................16

# Table of Authorities

Page(s)

Cases:

Gall v. United States,
  552 U.S. 38 (2007) ............................................... 15
United States v. Babauta,
  2023 WL 6458649
  (9th Cir. Oct. 4, 2023) ......................................... 12
United States v. Dayea,
  32 F.3d 1377  (9th Cir. 1994) .................................... 7
United States v. Ehmer,
  87 F.4th 1073 (9th Cir. 2023) ................................ 7, 12
United States v. Faulkner,
  952 F.2d 1066 (9th Cir. 1991) .................................... 5
United States v. Johnson,
  529 U.S. 53 (2000) .............................................. 16
United States v. Lee,
  790 F.3d 12 (1st Cir. 2015) ...................................... 9
United States v. Michael,
  220 F.3d 1075 (9th Cir. 2000) ................................. 5, 7
United States v. Miller,
  953 F.3d 1095 (9th Cir. 2020) ................................... 15
United States v. Pham,
  545 F.3d 712 (9th Cir. 2008) ..................................... 9
United States v. Treadwell,
  593 F.3d 990 (9th Cir. 2010) .................................... 15
United States v. Two Moons,
  486 Fed. Appx. 628 (9th Cir. 2012) .............................. 10
United States v. Yoder,
  2024 WL 3338937
  (D.D.C. July 5, 2024) ............................................ 5

Statutes:

18 U.S.C. § 3553(a) .......................................... 13, 14
18 U.S.C. § 2261A(2) .......................................... 1, 9
18 U.S.C § 2264 ................................................. 16

Rules:

U.S.S.G. § 1B1.1 ........................................ 4, 6, 8, 13
U.S.S.G. § 2A2.2 ......................................... 4, 7,8 , 9
U.S.S.G. § 3A1.2 .............................................. 4, 10
U.S.S.G. § 4C1.1 ................................................ 10

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On May 15, 2025, a jury convicted defendant Jonathan Lipman for the relentless stalking and harassment of New Jersey Superior Court Judge K.R.  Over the course of eight months, defendant sent scores of violent, graphic emails to Judge K.R., wishing her a public and painful death; left voicemails at the courthouse referencing school shootings; and tracked down the Judge's home address.  As described below, the government agrees with the United States Probation and Pretrial Services Office ("USPPO") that defendant's Guidelines sentence is 60 months' imprisonment (i.e., the statutory maximum sentence), which is otherwise below the Guidelines range associated with defendant's conduct --- here, with a total offense level of 28 and a Criminal History Category of I, the Guidelines sentence is 78 to 97 months' imprisonment.

Defendant's unyielding harassment of Judge K.R. and the consequences of his actions, including the lasting trauma and impact on K.R. and her family, warrants significant punishment and deterrence.  Accordingly, the government recommends that the Court impose the Guidelines sentence of 60 months' imprisonment, followed by three years of supervised release; restitution in the amount of $2,726.95; and the imposition of a $100 special assessment.

**II.   DEFENDANT IS CONVICTED OF STALKING K.R.**

Following a three-day trial, a jury convicted defendant of one count of Stalking Judge K.R. in violation of 18 U.S.C. §§ 2261A(2)(B), 2261(b)(5).  (Dkt. 188.)  At trial, the government presented extensive evidence of defendant's harassing conduct directed towards Judge K.R., including scores of violent emails

defendant sent to K.R. outlining his detailed death wish for her, and establishing that defendant tracked down the judge's home address to leave a voicemail on her neighbor's phone.  Some of defendant's emails included the following statements directed at the judge:

- "I pray every single day that you suffer a slow and painful death . . . I pray you have some issue with your lungs and your family watches you die slowly struggling to breathe like many Jews in the holocaust"
- "Please god kill her violently. but with cancer or a lower gi bleed. something long and dragged out that robs her of her ability to speak for years."
- " the world would be better off if [K.R.] died tomorrow . . . massive car accident. gun shot wound. beheading. Stroke."
- "once again let us pray that [K.R.] dies the most painful natural death possible. or decapitation"; and
- An email describing K.R. "being dragged to the gallows" "begging and pleading like a nazi" . . . "people throw feces on her. [K.R.] is st[r]ipped naked . . . They hang her . . . [K.R.] doesn't die right away.  She suffocates.  It takes minutes."  (PSR ¶¶ 20-21.)

Defendant persisted in his campaign to terrify Judge K.R. despite roadblocks.  Indeed, after the court blocked defendant's primary email address, he created multiple secondary accounts to circumvent those safeguards to continue his harassment of Judge K.R. (See, e.g., Trial Tr. Vol. II at 388:3-7.)  And despite a warning from law enforcement to stop his conduct, defendant continued.  (Id. at 340:24-25, 341:1-8.)

2

Defendant's repeated actions had significant consequences for Judge K.R. and her colleague Probation Officer E.C. As she testified at trial, Judge K.R. is still deeply traumatized by defendant's conduct. (Id. at 386:11-25.) As a result of defendant's conduct, Judge K.R. sought therapy, had to install an expensive security system at her house, and had her local police department conduct directed patrols of her residence and neighborhood following a barrage of threatening emails from defendant in July 2023. (PSR ¶¶ 26-28; Trial Tr. Vol. III at 416:6-21.) E.C. also testified that she had to take steps to protect herself after receiving defendant's violent voicemails. These measures included: installing a camera in her backyard, staying at her boyfriend's house, which was two towns away, and requesting police checks for weeks. (Trial Tr. Vol. II at 348:13-18.)

Moreover, after serving on the bench for approximately 14 years, Judge K.R. explained that defendant's actions made her question her profession. She testified that she would have quit if she could have afforded to because "to be opening my work e-mails on any given day, to find these horrific, vile e-mails from Mr. Lipman is beyond a disgruntled litigant who's unhappy with a judge's decision. And I didn't sign up for that as part of my job." (Id. at 389:1-4.) Had she wanted to protect herself, she explained, she could have denied the restraining order against defendant, "but that's not what I've been appointed to the bench to do. I'm appointed to carry out the law and render justice and protect the citizens of New Jersey, and that's what I did." (Id. at 389:19-21.)

3

**III. PSR GUIDELINES CALCULATIONS**

The government agrees with USPPO's Guidelines calculation in the PSR:

| | | |
|---|---|---|
| Base Offense Level: | 18 | U.S.S.G. § 2A6.2(a) |
| Possession, or Threatened Use, of a Dangerous Weapon & Pattern of Activity: | +4 | U.S.S.G. § 2A6.2(b)(1)(D), (E) |
| Official Victim Adjustment: | +6 | U.S.S.G. § 3A1.2(b) |

The government also agrees with USPPO that defendant's criminal history is Category I. (Id. ¶ 66.) Accordingly, with a total offense level of 28 and a Criminal History Category of I, the resulting Guidelines range is 78 to 97 months' imprisonment.

### A.   Possession, or Threatened Use of a Dangerous Weapon

The government agrees with USPPO that defendant's base offense level should be increased by 2 levels because the offense involved the "possession, or threatened use, of a dangerous weapon." U.S.S.G. § 2A6.2(b)(1)(D). The day after Judge K.R. issued a restraining order preventing defendant from possessing a firearm, defendant sent an email to Judge K.R. with a picture of a shotgun immediately below a winky face. (See government's Trial Exhibit 7.) The subject line of the email was, "Is a photo illegal?" (Id.)

The adjustment applies here because the Guidelines term "dangerous weapon" includes "(ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)." U.S.S.G. § 1B1.1,

4

Application Note 1(E).  First, there is no real dispute that defendant "possess[ed]" the object, § 2A6.2(b)(1)(D), as he admitted in an interview with the FBI that the gun in the email he sent to K.R. belonged to his former roommate.  (PSR ¶ 39.)  Second, just as defendant intended, the object he possessed, photographed, and sent to Judge K.R. closely resembles a firearm.  See United States v. Michael, 220 F.3d 1075, 1076 (9th Cir. 2000) (holding that a cellphone qualified as a dangerous weapon when represented by defendant to be a gun, because whether "an object constitutes a dangerous weapon depends more on the object's ability to incite fear and violence because it appears to be dangerous than on its latent capability").  Accordingly, the enhancement applies regardless of whether the firearm was real or operable.  See, e.g., United States v. Faulkner, 952 F.2d 1066, 1073 (9th Cir. 1991) (toy gun qualified as dangerous weapon); see also United States v. Yoder, No. 21-CR-505 (RCL), 2024 WL 3338937, at *4 (D.D.C. July 5, 2024) ("even if [defendant's] sword was a prop, it nonetheless "closely resemble[d]" a real sword—which is sufficient to be considered a dangerous weapon under the Guidelines").
///
///
///

5

Indeed, a straightforward comparison between the photo defendant sent (picture on the left taken from Trial Exhibit 7) and an operable lever-action shotgun (picture on the right)[1] shows that the object in defendant's photograph "closely resembles" a firearm.

 

Accordingly, a plain-text application of the Guidelines to defendant's conduct shows that he "possess[ed]" a dangerous weapon under § 2A6.2(b)(1)(D).

The enhancement also applies because defendant "used the object in a manner that created the impression that the object was such an instrument." U.S.S.G. § 1B1.1, Application Note 1(E). As Judge K.R. testified at trial, she "took [defendant's email] as a threat," as a "ha ha, basically. You entered an order saying I can't have this and look what I have right here." (Trial Tr. Vol. II, 368:4-15; see also id. at 367:24-25, 368:1-6 (Judge K.R. explaining that she was "alarmed and concerned" that defendant was sending a photograph of a

---

[1] See Sportsman's Warehouse, "Henry Lever Action Axe 410 Gauge 2-1/2in Blued/Walnut Lever Action Shotgun - 15in" available at https://www.sportsmans.com/shooting-gear-gun-supplies/shotguns/henry-lever-action-axe-410-gauge-2-12in-bluedwalnut-lever-action-shotgun-15in/p/1638591 (last visited Sept. 18, 2025).

6

firearm immediately after she prohibited such possession).)  Given the context of defendant's possession and use of the object --- specifically, sending an email with a photograph of what appeared to be a shotgun to a judicial officer who had just one day prior prevented him from possessing a firearm --- it was precisely meant to create the impression that the object was such an instrument and "incite fear" in Judge K.R., see Michael, 220 F.3d at 1076.

Defendant's contention that a "picture of what appears to be a firearm, in this context" does not qualify as a dangerous weapon (Dkt. 210 at 4.), therefore ignores the plain text of Application Note 1(E), and discounts the temporal context in which defendant sent the photograph to Judge K.R.

The enhancement also applies because defendant "threatened [the] use [] of a dangerous weapon." U.S.S.G. § 2A6.2(b)(1)(D).  "What makes use of a dangerous weapon (such as a vehicle) culpable conduct, warranting increased punishment, is use of such an object *in its capacity as a weapon*-that is, using it for the *purpose* of injuring or threatening to injure." United States v. Dayea, 32 F.3d 1377, 1380 (9th Cir. 1994) (emphasis in original) (analyzing the term "use" in U.S.S.G. § 2A2.2(b)(2)(B), which provides for an enhancement were a dangerous weapon was "otherwise used" or "its use was threatened"). While defendant did not "use" the object in precisely the same manner in which a bank robber threatens a teller with a toy gun, defendant's mocking email to Judge K.R. was sent precisely "for the purpose of [] threatening to injure" and incite fear in Judge K.R.

Indeed, as explained in United States v. Ehmer, it "may thus be that, at least in the context of defendants who threaten to use a weapon in their possession, there is now an almost total overlap

7

between the guidelines' current broadened definition of 'brandishing' and the ordinary understanding of 'threatening to use.'" 87 F.4th 1073, 1140 (9th Cir. 2023). The Guidelines further define "brandished" to mean "that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person." U.S.S.G. § 1B1.1, Application Note 1(C). Thus, the context of defendant's mocking email to Judge K.R. --- openly displaying his seeming possession of firearm in contravention of a judicial order --- shows he used the object with intent to threaten, intimidate, and stoke fear.

### B. Pattern of Activity Involving Stalking, Threatening, Harassing, or Assaulting the Same Victim

The government also agrees with USPPO's imposition of the 2-level upward adjustment because defendant engaged in "a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim." U.S.S.G. § 2A6.2(b)(1)(E). Application Note 1 to the section defines "[p]attern of activity involving stalking, threatening, harassing, or assaulting the same victim" to mean "any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction." Here, defendant's eight-month campaign to harass and stalk Judge K.R. involved sending at least 28 separate emails --- many of which described her graphic death --- directly to Judge K.R. from February to September 2023 (see government's Trial Exhibits 7-30), leaving two voicemails at the courthouse directed towards Judge K.R. and Probation Officer E.C. (see government's Trial Exhibits 4-5), tracking down the judge's home address, and leaving a voicemail about Judge K.R. on her neighbor's

8

phone in February 2023. Defendant's conduct was extensive, and defendant took each step with the purpose of stalking, threatening, and harassing defendant's victim to warrant this adjustment. See, e.g., United States v. Lee, 790 F.3d 12, 14, 19 (1st Cir. 2015) (affirming district court's imposition for pattern enhancement where defendant sent hundreds of emails to victim throughout a months-long period).

Defendant argues that the imposition of a two-level enhancement under Section 2A6.2(b)(1)(E) is impermissible double counting. (Dkt. 210 at 6-7.) This is incorrect given the scope and nature of defendant's conduct. The Ninth Circuit has made clear that "[t]here is nothing wrong with double counting when it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct." United States v. Pham, 545 F.3d 712, 717 (9th Cir. 2008) (cleaned up). Accordingly, although the actions that form the basis of the enhancement were charged in the Indictment, the cyberstalking statute criminalizes a "course of conduct", defined as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. §§ 2261A(2), 2266(2). Here, defendant took well over 2 acts directed towards Judge K.R. for an eight-month period, and thus the base offense level (i.e., starting point) that corresponds to a stalking conviction does not adequately capture the extent of his conduct. His pattern included searching out (and finding) Judge K.R.'s address, contacting her neighbor, contacting her place of work, and the continuous nature of defendant's emails. Thus, the imposition of this enhancement ensures that the Court will accurately capture the full extent of the wrongfulness of defendant's extensive, prolonged behavior. See

United States v. Two Moons, 486 Fed. Appx. 628 (9th Cir. 2012) (holding that defendant's "pattern of assaulting [the victim] could be used to enhance his sentence pursuant to § 2A6.2(b)(1)(D) because the base offense level set in § 2A6.2(a) did not take that pattern into account and did not capture the full extent of the wrongfulness of [defendant's] behavior").

### C. Victim Related Adjustment

The government agrees with USPPO's imposition of the 6-level upward adjustment pursuant to U.S.S.G. § 3A1.2(b) because it is undisputed that Judge K.R. is a government officer. Moreover, the testimony and exhibits at trial and chronology of defendant's actions clearly establish that his conduct was motivated by Judge K.R.'s position as the judicial officer who presided over defendant's case. (See, e.g., Trial Ex. 13 (defendant's February 4, 2023, email to K.R. stating, among other things, "If you don't like me contacting you why don't you respond with an email and say so. Oh right you're a government . . . When I contact you with things you don't like it's personal. When you don't want to respond it's because you are a government entity."); Trial Ex. 15 (defendant's March 14, 2023, email to K.R. stating "Cancer and coronavirus and emphysema exist to balance out bigots like you abusing your privilege.").)

### D. Defendant is Not a Zero Point Offender

The government agrees with USPPO that defendant is not entitled to a 2-level reduction pursuant to U.S.S.G. § 4C1.1 because he does not satisfy two of the necessary criteria to warrant the reduction: (1) defendant did not use violence or credible threats of violence in connection with the offense; and (2) defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of

a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense.

First, defendant's offense involved credible threats of violence. Defendant's emails to Judge K.R. were replete with violent, graphic details of his death wishes for the Judge. Specifically, in a series of rapid-fire emails on July 23, 2023, defendant wrote, among other things, that "the world would be better off if [K.R.] died tomorrow"; "once again let us pray that [K.R.] dies the most painful natural death possible. or decapitation"; "knives over guns . . . guns are too quick"; "the ted bundy's. The people who target an individual. They get the attention . . . They generally dont use don't use guns either. it's the gun that usually gets them caught. They just like strangle people or use knives." (PSR ¶ 21.)

Judge K.R. testified that she "just s[aw] one after another randomly, you know, coming in rapid fire. And the subject lines completely traumatized me, saying that -- you know, praying for [K.R.] to die as soon as possible, [K.R.] must die tomorrow, knives over guns. Guns would be too merciful basically for me. I need to be knifed to death and suffer . . . I was hysterical." (Trial Tr. Vol. II at 380:18-23.) Judge K.R. also explained that she read defendant's emails to mean that defendant thought she "deserved worse" than the "horrible rampage," "classroom shootings," and other "horrible tragedies that have happened in our country." (Id. at 387: 15-19.)

In response to this barrage of emails, she immediately called the New Jersey judiciary security hotline and her local police department given her "serious concern for her "physical safety [and]

11

mental health." (Id. at 382-83.) And as explained above, defendant's actions caused local police to conduct targeted patrols at the judge's house. (Trial Tr. Vol. III at 416:6-21.) Thus, given the specificity of defendant's threats to the judge; the fact that the judge did not know where defendant was at the time he sent the email; that defendant knew where Judge K.R. lived at the time he sent the barrage of emails; and that defendant's inflammatory language used to describe Judge K.R.'s death (either by gun, knife, beheading, or asphyxiation) was a continuing escalation in his *ex parte* communications with a judicial officer, it is objectively reasonable that Judge K.R. viewed defendant's conduct as credible threats of violence, rendering him ineligible for a two-level decrease. See, e.g., United States v. Babauta, No. 21-10252, 2023 WL 6458649, at *1 (9th Cir. Oct. 4, 2023) (rejecting defendant's claim that statements "you're going to get it," "I'm burning everything," and "I'm going to burn you alive" did not constitute "credible threats" under U.S.S.G. § 2D1.1(b)(2) despite defendant's claim that threats were not credible because defendant "says those kinds of things to [the victim] all the time"); see also United States v. Ehmer, 87 F.4th 1073, 1140 (9th Cir. 2023) ("a 'threat' is generally understood as a communication, by words or actions, that a reasonable person would foresee would be interpreted by its targets as 'a serious expression of intent to harm or assault'); *Threat*, Black's Law Dictionary (12th ed. 2024) ("A communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, express or implied, of an intent to inflict loss or pain on

another"); *Credible*, Webster's Third New International Dictionary (1993) ("Capable of being credited or believed").

Moreover, for the reasons set forth in Section II.A, defendant possessed a "dangerous weapon" as that term is defined in U.S.S.G. § 1B1.1, Application Note 1(E).

**IV.  THE GOVERNMENT'S RECOMMENDED SENTENCE IS WARRANTED**

The government recommends that the Court sentence defendant to a sentence of 60 months' imprisonment followed by three years' supervised release; a $100 special assessment; and no fine. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A.  Nature And Circumstances of The Offense; History and Characteristics of Defendant**

The nature and circumstances of the offense, and history and characteristics of the defendant, support the government's recommended sentence. See 18 U.S.C. § 3553(a)(1). Defendant's conduct in this case was targeted, relentless, graphic, and consequential --- as Judge K.R. emotionally testified at trial, the trauma caused by defendant's actions will have a lifetime impact on her career and well-being. Defendant unleashed a torrent of anger and terror at the judge simply because she was carrying out her sworn duties as a judicial officer to protect the public. His words dehumanized her, and his conduct, in seeking out her home address and threatening her with repeated, descriptive death wishes, terrorized her. Although the government recognizes that defendant has no criminal history and describes a history of abuse as a child, his substantial history of sending threatening and harassing communications to government officials --- including the disturbing

13

entries that defendant posted on Facebook leading to K.R.'s issuance of the restraining order against defendant (PSR ¶¶ 4-11) --- warrant a significant sentence.  Accordingly, these factors support the government's recommended sentence.

> **B.   Need To Reflect Seriousness of Offense; Promote Respect for The Law; Provide Just Punishment; Afford Adequate Deterrence; and Protect the Public from Further Crimes**

The sentence must satisfy the need to punish defendant, as well as society's need to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and protect the public.  18 U.S.C. § 3553(a)(2).  The government's recommendation satisfies all of these factors.  The seriousness of the offense --- specifically, the targeting of a judicial officer who issued a ruling against a litigant --- cannot be understated, especially given the history of violence from disgruntled litigations (see, e.g., PSR ¶ 31).  Similarly, the sentence will provide adequate deterrence, both for defendant and, more generally, for other individuals upset or dissatisfied with the rule of law.

The government's proposed sentence also provides a just punishment for defendant's conduct.  As described above, defendant's victim believes she will suffer lifelong trauma from his conduct.  And defendant's use of language, imagery, and intimidation caused substantial emotional distress and fear.

Moreover, although defendant states that he is now remorseful for his conduct, he continues to maintain that his intention was to "to protest the actions of Lacey Township and Ocean County."  (PSR ¶¶ 41-42.)  The expansive scope of defendant's conduct, coupled with his

14

insistence following trial that his conduct was a form of protest, demonstrates that a significant sentence is needed to further deter defendant as well as protect the public from further crimes by defendant. Defendant's repeated, mocking, violent emails to K.R. showed that defendant wanted his actions to have an impact on K.R., and the testimony at trial showed that is precisely what happened. These factors therefore justify a 60-month term of imprisonment.

### C. Need to Avoid Unwarranted Disparities

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants. One way of doing so is to correctly calculate the Guidelines range and then sentence defendants within that range. See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."), overruled on other grounds by United States v. Miller, 953 F.3d 1095, 1103 (9th Cir. 2020); Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."). Here, under the correctly calculated Guidelines range, other defendants "with similar records who have been found guilty of similar conduct" as defendant can expect a prison sentence of 60 months' imprisonment. See U.S.S.G. § 5G1.1(a). As such, the government's recommended sentence avoids an unwarranted disparity with similarly situated defendants.

**D.  A Three-Year Term of Supervised Release is Just and Appropriate**

Given defendant's conduct, a three-year period of supervised release is necessary to provide defendant with oversight and supervision after his release from prison. See United States v. Johnson, 529 U.S. 53, 59 (2000) ("Congress intended supervised release to assist individuals in their transition to community life.").[2]

**E.  Restitution**

As correctly noted in the PSR, restitution in this case is mandatory pursuant to 18 U.S.C § 2264.  (PSR ¶ 139.)  That statute requires restitution for, among other things, "any other losses suffered by the victim as a proximate result of the offense."  18 U.S.C § 2264(3)(G).  Here, victim Judge K.R. installed a security system at her home for a total cost of $2,726.95 because of defendant's conduct.  (PSR ¶¶ 26-27.)  Accordingly, this cost was a proximate result of the offense and should be ordered as restitution.

**V.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 60 months' imprisonment; (ii) followed by three years of supervised release; (iii) a $100 special assessment; (iv) the waiver of fines; and (v) restitution in the amount of $2,726.95 payable to Judge K.R.

---

[2] The government recommends that the Court, at sentencing, verify that defendant has been informed of the standard conditions of supervised release enumerated in General Order 20-04, and then incorporate by reference and impose those conditions.